JACOB R. LEGUM ET AL *v.* STATE, USE OF AGNES W. MORAN ET AL

[No. 58, April Term, 1934.]

340

*Decided June 25, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Walter L. Clark* and *Joseph Sherbow,* with whom were *Clater W. Smith* and *S. Herbert Harris* on the brief, for the appellants.

*Isaac Lobe Straus* and *Richard H. Stevenson,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

North Avenue running east and west in Baltimore City is carried over the tracks of the Pennsylvania Railroad by a viaduct known as the North Avenue bridge. McMechen Street running northeast intersects North Avenut at the western end of that bridge, and ends there. The United Railways & Electric Company operates trolley cars over both North Avenue and McMechen Street, and the tracks on North Avenue are connected with those of McMechen Street by a set of curves and switches beginning at a point between thirty and forty feet east of McMechen Street and extending southwesterly. At the intersection, North Avenue and McMechen Street form two sides of a triangular plot of ground, and going west along the North Avenue side of that triangle are, in order, a small grass plot, a fire engine house, and the business establishment of Ditch, Bowers & Taylor. The apex of the triangle is about ninety feet from the west end of the bridge, and from the southeast curb of McMechen Street to the north curb of North Avenue at that point is about 130 feet. Intersecting North Avenue opposite the intersection is a narrow street or alley called Lord Street, running northwest from North Avenue. At that intersection, at the apex of the triangle and at the northeast corner of McMechen Street and North Avenue, are traffic lights. Those lights are so set that when traffic bound west over North Avenue and McMechen Street is allowed to proceed, traffic bound east over those streets at that point is stopped, and when the east bound traffic is released the west bound traffic stops; so that a pedestrian crossing North Avenue at that point must first clear the traffic going in one direction, and then the traffic going in the other, since each proceeds alternately across his path.

From the south curb of North Avenue to the south rail of the east bound street car tracks is eighteen feet seven inches, and the dummy space between the west and east bound tracks is about six feet five and one-half inches wide, and in that space are the trolley poles. There appears to be at the intersection no physically defined cross-

ing for pedestrians going north or south over North Avenue to or from McMechen Street. Near the south curb of North Avenuue, in the sidewalk, slightly east of the intersection, there is an electric light pole on which is placed one of the traffic lights. The distances noted are approximate.

Early in the evening of February 7th, 1933, William P. Gardiner, proceeding east over North Avenue, when about half way "across McMechen Street," saw Sidney G. Moran, husband and father, respectively, of the equitable plaintiffs, standing on North Avenue between the rails of the east bound railway tracks, facing north. The automobile in which Gardiner was a passenger was traveling at about thirty miles an hour. Proceeding in the same direction, to the left and slightly ahead of that machine, was one owned by the defendant, the Park Circle Motor Company, and operated by William Becker, its employee, apparently traveling at about the same speed, which was "straddling the south rail of the east bound track." The Becker car proceeded on its course, with no perceptible lessening of its speed, and Moran remained in his position without moving, until he was struck by the Becker automobile. As a result of the collision, Moran was so badly injured that he died, and this suit was brought by his widow and children to recover compensation for his death, on the theory that the direct and proximate cause thereof was the negligence of Becker in operating his employers' automobile. The defense was contributory negligence, and to that defense the plaintiffs replied that, even if there was contributory negligence, Becker should have known of Moran's peril in time to have avoided striking him, had he exercised reasonable and ordinary care.

The case was tried in the Court of Common Pleas of Baltimore before the court and a jury, and, from a verdict and judgment for the plaintiffs, this appeal was taken.

In addition to the facts which have been stated, there was adduced at the trial evidence tending to prove these

facts, which will be stated in narrative form: At the time of the accident it was dark, but the street lights, which were burning, lighted up the bridge so that it was possible for the witness Gardiner to see clearly a block ahead of him; it had been raining earlier in the day, but at the time of the accident the rain had ceased and the surface of the street, while damp, had begun "to dry out a little"; when the accident occurred the traffic lights were set against west bound traffic, and one or two street cars had stopped at the switch, where regularly they took on and discharged passengers; when he was struck, Moran was about thirty-three yards east of the light pole at the corner of McMechen Street and North Avenue; broken glass was found between the rails of the east bound car tracks about seventy-five feet east from Mc-Mechen Street, or possibly as much as one hundred feet from that point; when he was struck Moran was standing about "two-thirds of the way back" or near the middle of the standing street car, if there was but one, or, if there were two, of the "easterly one"; the street cars were forty-four feet in length; from the time Gardiner first saw Moran, which was when he was about forty-one yards from him, Moran neither moved towards the dummy nor turned his head, so far as Gardiner could see, and was not looking in the direction from which traffic was coming. James A. Byrd, who was driving the automobile in which Gardiner was a passenger, saw Moran when he, Byrd, was about ninety-five yards away, and he was then standing in the east bound car tracks about eighteen yards east of McMechen Street; at that time Becker was driving in the east bound tracks to the left of the witness "kind of abreast" but "a little ahead of him," at about thirty miles an hour, and continued that rate of speed until he struck Moran, who at the time was about middle way of a standing trolley car facing it, which was in front of and north of him, and he, Byrd, heard no horn or other warning from Becker's car; when Byrd, proceeding east on North Avenue, passed Ditch, Bowers & Taylor's place, he saw the McMechen Street

traffic light change from red to green, which permitted east bound traffic to proceed, and, after Becker's car struck Moran, Becker drove it to the curb probably fifty or sixty feet east of the point of collision; its right front fender was dented and the glass of the right headlight broken.

*Contra*, there was evidence tending to prove that the night was foggy, that a drizzling rain was falling, that the visibility was farther lowered by vapor and smoke rising from the railway tracks which ran under the viaduct, that the headlights of approaching automobiles were very glaring, that numerous cars were approaching from the west and several ahead of him and others back of him, that Becker "travelled well up on towards the top of the crown of the bridge and all of a sudden a completely black object loomed up directly off his right hand fender, and the next instant he sort of brushed the gentleman right over the top of the fender itself"; that when Becker first saw him, Moran was about one or two feet away, that the street was wet and slippery, that his fender was not dented, but that his right headlight lens was broken and the headlight itself turned around, and that at the time of the accident he was driving at from eighteen to twenty-two miles an hour.

In connection with the examination of Byrd, who had known the location some twelve or fourteen years, he was asked if, at the time of the accident, Moran was standing "in the regular place that pedestrians use to cross the street." An objection to that question was sustained, and the plaintiffs then offered to prove "that the place at which Mr. Moran was standing at the time he was struck on the evening of the 17th of February, 1933, was at the place or in the position where people were and have been for many years accustomed to cross North Avenue at its intersection by McMechen Street, either to take a car west bound, standing at that point, or to go to the north side of North Avenue," and "that the place where for some fourteen years he had observed people were in the habit of crossing North Avenue at the point in question,

was the point or place or approximately the point or place in the line of which Mr. Moran was standing, facing the stationary trolley car, at the time he was struck. by the car driven by Mr. Becker." Those offers were also overruled, and those rulings, while not directly involved in this appeal, must be considered in connection with the questions submitted by the prayers.

At the close of the case the plaintiffs offered four prayers and the defendants eleven. The plaintiffs' four prayers were granted, and special exceptions to the third prayer overruled; the defendants' first and fifth prayers were granted as offered, their remaining prayers were refused as offered, but their third and and fourth prayers were modified and granted, and special exceptions filed to the modification of defendants' third and fourth prayers overruled. Those rulings are the subject of the only exception submitted by the appeal.

Becker's negligence was not denied in this court, so that the questions presented by the appeal are: (1) Was Moran guilty as a matter of law of contributory negligence? (2) Assuming that Moran was negligent, and that, as a result of his own negligence immediately prior to the collision which caused his death, he occupied and remained in a position of peril, was there evidence legally sufficient to support the conclusion that Becker should, in the exercise of ordinary care, have known that he was in a position of peril and unaware of his danger in time to have avoided striking him had he, Becker, used ordinary care to that end after he should have discovered Moran's danger?

In dealing with the first question as a matter both of law and logic the truth of every fact tending to exculpate Moran from the charge of contributory negligence must be assumed.

The first and most striking circumstance to be considered in connection with that issue is that at the time of the accident Moran was standing, apparently oblivious of his surroundings, a few feet south of the center of North Avenue, directly in the course of east bound traffic, and

the controlling inquiry is: (a) Had he any right to be there at all; (b) if he was entitled to be where he was, was he under a duty to exercise reasonable care and diligence to detect and avoid danger from traffic east bound on North Avenue; and (c) if he failed to exercise such care was he negligent as a matter of law?

Section 209, ch. 224, Acts of 1929, in part provides that: "All pedestrians shall have the right of way at street crossings in the towns and cities of this State, except where traffic is controlled at such crossings by traffic officers. Between street crossings in such towns and cities, vehicles shall have the right of way."

It is implicit in that statute that, while a pedestrian may lawfully travel on or across a city street "between street crossings," his right to so use the street is subordinate to that of vehicular traffic in the lawful use thereof, and that, while vehicular traffic may lawfully traverse street crossings, its right so to do is subordinate to that of pedestrians in the lawful use of such crossings, and that the relative rights of the operators of motor vehicles and pedestrians, in respect to any question of negligence arising from their use of the highway, must be tested by those rules. It is important, therefore, in such a case as this, in a collision between a motor vehicle and a pedestrian, to know whether the collision occurred within the limits of a pedestrian crossing, or whether it occurred between crossings.

There is no statutory definition of a "street crossing" in this state; nor does the record show that there is any physically defined crossing over North Avenue at its intersection with McMechen Street. In *Clarkson v. Ley*, 106 N. J. Law, 380, 148 A. 745, 746, the court construed a statutory definition of a crossing which provided that "the word 'crossing' includes all duly indicated crossings marked by a pavement or otherwise, and the most direct route from curb to curb at the intersection of streets." In that case the pedestrian attempted to cross Lexington Avenue at its intersection with Holdsworth Court, which intersected Lexington Avenue at a right angle, and end-

ed there. The question was whether there was a crossing at that point within the statute. It was held that there was, and, further, that "a pedestrian is upon a crosswalk or 'crossing' if she is within the confines of that portion of the highway which would be embraced within the boundaries of the lines of the sidewalk of the street entering the other highway at a right angle, if continued across the other highway." In *Ferris v. McArdle*, 92 N. J. Law, 580, 106 A. 460, 461, construing the same statute, in a case where the streets intersected each other at a very slight angle, it was held that the pedestrian was only required to take "the usual or natural course or line."

In this case McMechen Street intersects North Avenue at a wide angle. A direct course across North Avenue at that intersection, and at a right angle thereto, would require the pedestrian to cross two sets of switches which are at times occupied by street cars, and there are no physical lines to mark the limits of the crossing, nor can they be readily ascertained by projecting the lines of the sidewalks of the intersecting streets, as might be done if they intersected at a right angle. Moreover, when the traffic signals permitted pedestrians to cross over the south half of North Avenue at that point, they permitted vehicular traffic to move westerly over the north half thereof, and, when such traffic was permitted to move east, vehicular traffic west bound was stopped. So that a pedestrian, going north after crossing the south half of the way with the signals, might find his way across the avenue blocked by street cars, if the signals changed to permit the east bound traffic to move before he completed his crossing.

Under such circumstances, neither the precise location nor the exact width of the crossing could be definitely defined, nor could any definition of it be given more specific than that of the most direct route across the street at the intersection.

The plaintiff offered evidence to show where, over a period of fourteen years, persons were accustomed to

cross the street at that point, but the offer was refused. That evidence, if coupled with other evidence showing that Moran knew of the custom, may have thrown light on the question, and if the offer had included that qualification it would no doubt have been admitted: but as this is a defendant's appeal the ruling is not reviewable. Its exclusion, however, was not material, for there is in the case other evidence from which it could have been inferred that Moran was standing within the limits of the crossing when he was struck.

One witness, Byrd, testified that when Moran was struck a west bound trolley car had stopped at the switch, and that Moran was "standing, he thinks, about middleway of the trolley car by the side of the car," and that at that time no other street car was there. There was also evidence that all the street cars stopped at the same point, that the car standing near the switch at the time of the accident had stopped at the "regular stopping place," "where the cars take on and let off passengers at that point, * * * right at the switch * * * about fifteen or twenty feet from the corner where the switch is."

Under such circumstances it was for the jury and not for the court to say whether Moran was within the crossing when he was struck. For it cannot be said as a matter of law that the crossing was over the switches directly in front of a car which might start whenever the traffic signals changed and place a pedestrian attempting to cross the street, not only in front of the street car, but in front of all traffic moving west with the signal, which he could not see until he cleared the street car, any more than it can be said that the crossing was behind or to the rear of cars stopping at the switch. Certainly it may be inferred from the fact that the street cars took on and discharged passengers there, that the passengers so discharged had the right to cross the street. Ordinarily, when streets intersect at right angles, the pedestrian crossing would be in front of street cars and other traffic stopped at the crossing, for all traffic, pedestrian and vehicular, would move together in the same direction. But

because of its unusual character there can be no such natural inference, certainly no conclusive presumption, as to the location of the crossing involved here. Whether upon the facts stated Moran was within that crossing when he was struck was therefore a question not of law but of fact. Assuming that Moran was standing within the crossing when he was struck, the question is whether he was negligent as a matter of law in failing to exercise reasonable care and diligence to detect and avoid danger from east bound traffic.

There is no direct evidence to explain how he reached the place where he was standing, but it is undisputed that he was standing directly in the path of traffic proceeding east with the traffic signal on one of the most traveled thoroughfares in Baltimore City. If he had started to cross with the traffic signal, he could have proceeded at least beyond the center of the street, where he would have been temporarily protected from east bound traffic, because the traffic light was set against west bound traffic. If he had alighted from a street car he could for the same reason have crossed to the north side of the street. But he elected to remain south of the center of the street in a position where inevitably he was exposed to the hazards of lawfully moving traffic. Under such circumstances he was under a legal obligation to use reasonable care to protect himself, to discover danger which a reasonable man should have anticipated, and to avoid it. Under present conditions, where, because of the congestion occasioned by vehicular traffic over city streets, it is becoming increasingly difficult either to stand still or to move with safety, and where crossing a street may well become a perilous adventure, no one can place himself directly in the path of on-coming traffic in blind indifference to, or unconsciousness of, his situation, without subjecting himself to the charge of negligence, whether he be within or without the limits of a crossing.

In this case Moran was standing between the rails of the east bound car tracks looking north, that is, in the direction of the west bound traffic, which was obstruct-

ing his progress across the northern half of the street, and there is evidence that for a few seconds before he was struck he did not move at all, "except that he may have moved a muscle or so"; that he did not "move visibly"; that he did not move so far as the witness "noticed"; that he did not look at all in the direction from which traffic was coming. In connection with that testimony it may be noted that the only unobstructed space into which Moran could have moved was that part of the dummy which was not taken up by the overhang of the standing street car, and it is consistent with the testimony that from his position he could see traffic approaching from the east, because, even with his face towards the north, by merely turning his eyes he could have looked towards the east. He could, it is true, have moved into the dummy, but except for the wholly inadequate space protected by the trolley poles, as soon as he was protected from the east bound traffic, he may have been exposed to the west bound traffic. Under those conditions, while his conduct in standing where he was, watching the west bound traffic and waiting for it to clear, may have been negligent in fact, it was not necessarily negligent in law, in view of the fact that the jury could have found that he was within the limits of the crossing. The two cases cited to the contrary (*Webb-Pepploe v. Cooper,* 159 Md. 426, 151 A. 235, and *Barker v. Whitter* 166 Md. 33, 170 A. 578), were each predicated upon the fact that the collision occurred between crossings. Cases more nearly in point are *Consol. Gas etc. Co. v. Rudiger,* 151 Md. 226, 134 A. 326; *Panitz v. Webb,* 149 Md. 75, 130 A. 913; and *Merrifield v. Hoffberger,* 147 Md. 134, 127 A. 500, 503, where upon analogous facts the plaintiff's negligence was held to be a question for the jury. In the case last cited the following quotation from *Knapp v. Barrett,* 216 N. Y. 226, 110 N. E. 428, was approved: "A wayfarer is not at liberty to close his eyes in crossing a city street. His duty is to use his eyes, and thus protect himself from danger. * * * The law does not say how often he must look, or precisely how far, or when

or from where. If, for example, he looks as he starts to cross, and the way seems clear, he is not bound as a matter of law to look again. The law does not even say that, because he sees a wagon approaching, he must stop till it has passed. He may go forward unless it is close upon him; and whether he is negligent in going forward will be a question for the jury. If he has used his eyes, and has miscalculated the danger, he may still be free from fault." The defendant's demurrer prayers predicated upon theories inconsistent with those conclusions were therefore properly refused.

The main question argued in this court, however, was as to whether there was legally sufficient evidence to support the hypothesis that Becker had the last clear chance to have avoided the accident had he exercised reasonable care. That question, however, was not directly raised in the lower court either by prayer or appropriate special exception, for while there were special exceptions they were based upon wholly different grounds. If the defendants had desired to object to plaintiff's prayers, or to the court's modification of their own prayers, for that reason, they should have specifically excepted thereto on the ground that there was in the case no evidence legally sufficient to support the hypotheses submitted by such prayers or modifications. Having failed to do that, they cannot raise the question for the first time in this court. Code, art. 5, sec. 10 and annotations thereto. 2 *Poe, Pl. & Pr.* sec. 298 *et seq.; Zell v. Dunaway,* 115 Md. 4, 80 A. 215; *White v. Parks,* 154 Md. 201, 140 A. 70, and cases there cited.

But there was error in granting defendants' third and fourth prayers as modified by the court. No point was made in this court to the refusal of those prayers as offered, and for that reason those rulings will not be reviewed. Rule 39, Court of Appeals. Both prayers, as offered, were predicated upon the hypothesis that the collision occurred between crossings, and the defendants were entitled to have the jury instructed as to the law relating to such a situation and the trial court accepted

so much of the prayers as dealt with it, but ingrafted c each prayer a modification denying recovery, "unles the jury further find that after the said Sidney G. Mora had reached the position occupied by him when struc' he remained there and either was seen or could hav been seen by the defendant Becker in the exercise of ord nary care in time for the defendant Becker to avoi striking him had the said defendant exercised ordinar care to avoid striking him." That modification submitte two propositions, neither of which was involved in th original prayer; one, that the instructions applie whether the accident happened at a crossing, or betwee crossings, and that the law in either case was the same and, two, that the driver of an automobile is bound at hi peril to anticipate (a) the presence of pedestrians b( tween crossings, and (b) that such pedestrians, althoug capable of doing so, will not yield the right of wa] Neither proposition was sound.

By the express terms of the statute, pedestrians hav the right of way at street crossings, and motor vehicle between street crossings, and each is bound to recogniz the right thus conferred by the statute upon the othe1 and to regulate his movements accordingly. So, while pedestrian may lawfully cross a street between stree crossings, he is bound to exercise a higher degree of car to avoid injury from traffic than if he crossed at a stree crossing; and while the operator of a motor vehicle ma; in ordinary course traverse a street crossing, he is boun( to exercise a higher degree of care to discover and avoi injuring pedestrians in the lawful use of such a crossin; than to discover and avoid injuring pedestrians usin; the highway between crossings, for each may assum that where it is reasonably possible the other will yiel( the right of way as required by the statute. *Berry, Lai of Automobiles*, sec. 355. That was the constructioı placed upon the statute, in so far as it defined the right of pedestrians at crossings, in *Merrifield v. Hoffberger supra*, and conversely the same reasoning would confe similar rights upon motor vehicles between crossings

subject to the qualification that, because of the dangerous nature of the instrumentality operated by the driver of a motor vehicle, the care required of him would differ in kind but not in degree from that exacted of a pedestrian. *Merrifield v. Hoffberger*, 147 Md. 141, 127 A. 500, 502. In the case last cited it was said: "Vehicles may have the right of way on a portion of a street or highway set aside for them, but at crossings, all drivers, particularly of motor vehicles, must be highly vigilant and maintain such control that on the shortest possible notice they can stop their cars so as to prevent injury to pedestrians." In *Jurisch v. Puget Transp. Co.*, 144 Wash. 409, 258 P. 39, 42, the court said: "The burden was not upon respondent, when starting across a well-lighted street at a well defined crosswalk, seeing a motor-bus across the street at the intersection, eighty-eight feet away, to thereafter continuously look up and down the street to avoid being run over by the motor-bus, which was at a safe distance away when he started across the street, on pain of being charged, as a matter of law, with contributory negligence. *Johnson v. Johnson*, 85 Wash. 18, 147 P. 649. In the last cited case we said: 'If the conceded right of way means anything at all, it puts the necessity of continuous observation and avoidance of injury upon the driver of the automobile when approaching a crossing, just as the necessity of the case puts the same higher degree of care upon the pedestrian at other places than at crossings.' "

In the first paragraph of the prayers under consideration, as offered, they were made to apply only if the jury found that the collision occurred "some distance away from the street crossing," while the modification added by the court made them apply if it occurred after Moran had "reached the position occupied by him when he was struck," which may, according to the evidence, have been either at a crossing or between crossings. A similar prayer in *Dashiell v. Jacoby*, 142 Md. 341, 120 A. 751, was held bad, and the judgment reversed partly for that reason.

The amendment added by the court rested upon the doctrine of the "last clear chance," which is that where one has through his own negligence placed himself in danger of injury at the hands of another which he is unable to prevent, that if the other knows or should know of his peril in time to avoid injuring him, and he fails to exercise reasonable care to do so, he is guilty of actionable negligence. That doctrine, which is fast becoming settled, is not to be confused with that of concurrent negligence, which is essentially a different thing. The basis of the doctrine of last clear chance is that the actor either has actual knowledge, or is under some legal duty which charges him with knowledge, (a) that if he persists in a course which he is pursuing it will result in injury to another, (b) which the other cannot, because of ignorance or disability, be reasonably expected to avoid, (c) when the actor either has or is chargeable with that knowledge in time by the exercise of ordinary care to avoid injuring the plaintiff, but (d) fails to do so. *Bohlen, Studies in Law of Torts,* 293, note 5; 45 *C. J.* 984, 11 *C. J. et seq.;* 20 *R. C. L.* 138 and *Suppl.* Concurrent negligence may be attributed to one who negligently occupies a position of known danger, and continues to occupy it until injury results, when he could by reasonable care and diligence have escaped therefrom in time to have avoided the injury, and where the defendant, although he knew of plaintiff's position, may reasonably have inferred that he would move to a place of safety in time to escape injury.

Assuming, as these prayers do, that the accident may have happened between crossings, the doctrine of last clear chance was wholly inapplicable. Assuming that Becker was chargeable with constructive notice of Moran's position in the street, it would be carrying the doctrine to extreme and unwarranted lengths to charge him also with constructive notice of the hypothetical fact that Moran was not aware of his, Becker's, approach. Moran's position, facing north, permitted him by merely turning his head, or even his eyes, to observe both east

and west bound traffic, and Becker was justified in assuming that no reasonably prudent man would occupy Moran's position without observing east bound traffic, some of which had already passed him. Since he was not chargeable with constructive notice that Moran was unaware of his approach, and since the uncontradicted evidence is that he had no actual notice of any such fact, he was justified in assuming that Moran would yield the right of way and step out of danger. There was evidence to support a clear inference that Becker was guilty of culpable negligence in the operation of the automobile, just as there was evidence to support the conclusion that Moran was negligent in remaining in the path of on-coming traffic, when by a couple of steps he could have reached a place of at least temporary safety. The negligence of both was concurrent, and continued up to the very moment of the collision. Under such circumstances, the case fell within the rule announced in *United Railways Co. v. Sherwood*, 161 Md. 304, 157 A. 280, rather than that stated in *Trenary v. United Railways Co.*, 143 Md. 112, 122 A. 20. The modifications added to the defendants' third and fourth prayers were therefore erroneous, because they assumed as a matter of law that if Becker "could" have seen Moran's position, even though it was between crossings, he was bound to know that Moran was ignorant of his approach and that he would not yield to him the right of way. The same vice also affected the plaintiff's third prayer, and it too should have been refused.

For these errors, the judgment appealed from must be reversed.

> *Judgment reversed, with costs, and new trial awarded.*