MEYER WEISSMAN ET AL. *v.* MAY HOKAMP
[No. 26, October Term, 1936.]

198

*Decided January 12th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*H. Beale Rollins* and *F. Gray Goudy*, for the appellants.

*James J. Lindsay*, for the appellee.

BOND, C. J., delivered the opinion of the Court.

Appealing from a judgment for damages sustained by a pedestrian in a collision with their taxicab, the appellants present for review two rulings of the trial court. The first is the admission in evidence of a report by the taxicab driver to the Public Service Commission, contrary to the prohibition in section 372 of article 23 of the Code. This ruling the court finds insufficient to require a reversal for retrial, because the statements contained in the report added nothing to the evidence unfavorable to the defendants, for they were contained also in a report to the Commissioner of Motor Vehicles introduced in evidence, as is permitted, for the purpose of proving an admission or a contradiction of the testimony of the driver in court (*York Ice Machinery Corp. v. Sachs*, 167 Md. 113, 127, 173 A. 240), and because the statements seem to this court to be the same in effect as those in the testimony. The second ruling is the refusal of prayers of the defendants for direction of a verdict in their favor because of the absence of legally sufficient evidence to prove negligence of the driver causing the accident, or because of the establishment of contributory negligence on the plaintiff's part.

The accident occurred at the crossing from south to north on the west side of the intersection of Light and Redwood Streets in Baltimore City, at about 12:25 P. M. on Monday, November 19th, 1934. There are street car tracks in the center of Redwood Street for both east and

west car traffic, the southernmost rail being about seventeen feet out from the southern sidewalk; and about four feet south of that rail, extending west from the Light Street building line, and the regular crossing for pedestrians, a row of iron posts on heavy bases, provides a safety zone except during the hours of crowded traffic. During other than the crowded hours a movable white disk on top of the westernmost post, bearing the words, "Keep to the right," is turned west, toward oncoming east bound traffic; and in the crowded hours the disc is turned the other way, so as to give no direction to east bound traffic, but on the contrary to expedite it by sending it through along the car tracks. At the time of the accident complained of it was turned thus, so as to run the traffic through along the tracks. These facts appear from testimony of the plaintiff and a witness on her behalf. She herself did not notice the sign that day.

During this, her lunch hour, when the plaintiff, walking north in the middle of the sidewalk on Light Street, came to the Redwood Street crossing, she found that the traffic signal light for the crossing had just turned red, against north bound traffic and giving the right of way to east and west bound vehicles. There were cars parked by the sidewalk to her left, or to the west of her. She waited with other pedestrians on the sidewalk until there seemed to be a clearing of passing vehicles, when she and others started across, still with the red light against them. She testified that, before stepping off the sidewalk, she looked west and failed to see within the distance of a block any vehicle coming east, and thenceforth looked only to her right, that she stopped at just about the southernmost track, to the north of an imaginary extension of the line of posts, and waited to see whether another vehicle coming from the east would come across, but it turned on Light Street. As she stood so, she said, the defendants' taxicab came from the west, caught her in some way with its fender, and pushed her along about two feet; and to avoid being thrown under the wheel she stepped to the front of the cab and was

thrown there. She declared at the time that it was her fault, but testified that she did so to avoid causing trouble to the driver.

Her own testimony makes it clear that when, as she said, she looked and saw no vehicle coming, the taxicab was nevertheless there, and in close proximity. To come from more than a block away while she walked out to the track it would have had to rush forward at an incredible speed. *Hill v. Philadelphia R. T. Co.*, 271 Pa. 232, 236, 114 A. 634. And when it collided with her it was going so slowly as to push her only two feet, and to permit her to step to the front of it; and it stopped at the spot. There was no testimony that the speed of the cab was fast, none at all on the movement of the cab, except that of its driver, who testified that he had just started on the change of lights behind a couple of cars in front of him. If the plaintiff looked for oncoming traffic she looked with an unseeing eye, and her testimony on the point could not be considered in the case. *Miller v. Baltimore*, 161 Md. 312, 316, 157 A. 289; *Susquehanna Power Co. v. Jeffress*, 159 Md. 465, 470, 150 A. 788; *Faucett v. Bergmann*, 57 App. D. C. 290, 22 Fed. (2nd) 718; *Yellow Cab Co. v. Lacy*, 165 Md. 588, 592, 170 A. 190.

Testimony of other witnesses to the accident all contradicted the version of the plaintiff, and added nothing to the case to be considered on her behalf. The weight of all the evidence was for the jury and for the court on the motion for a new trial, not for this court on the question of its legal sufficiency to support the verdict.

The plaintiff was crossing and taking a position in the street, then, when to her knowledge it was given over to traffic moving across her path. *Legum v. State*, 167 Md. 339, 348, 173 A. 565. Disregard by a pedestrian of the rule of the right of way does not, under any and all circumstances, amount to contributory negligence preventing recovery for injuries from collision. There might sometimes be no traffic on the right of way creating a risk of collision. Crossing against the right of way at

regular crossings gives rise to the same legal situation as crossing between regular crossings, where by statute, Code, art. 56, sec. 209, as amended by Laws 1929, ch. 224, vehicles have a right of way. *Nelson v. Seiler*, 154 Md. 63, 76, 139 A. 564; *Ebert Ice Cream Co. v. Eaton*, 171 Md. 30, 187 A. 865. It is notorious that the giving of the right of way alternately to traffic on one street and the other, while an indispensable measure of regulation, is not a completely successful one. Many pedestrians persist in attempting to filter through the traffic moving on the right of way. But there can be no question of their legal situation when doing so. By the very definition of the right of way they have no equal right in the street. They know their movements must be accommodated to those of the vehicles, that they cannot dispute the right of way with them, but must yield it and cross only as the traffic affords an opportunity to do so in subordination to the right given the vehicles. *Russo v. Grand Rapids*, 255 Mich. 474, 476, 238 N. W. 273; *Mertens v. Lake Shore Yellow Cab Co.*, 195 Wis. 646, 648, 218 N. W. 85; *Quaker City Cab Co. v. Fixter* (C. C. A.) 4 Fed. (2nd) 327; *Barker v. Whittier*, 166 Md. 33, 41, 170 A. 578. These principles give the measure both of what the pedestrians are to do, and of what the driver may expect them to do.

The plaintiff, however, differentiates her crossing by testimony from which it might be found that she assumed that vehicles were then, and at all times, excluded from moving along the tracks by the presence beside the tracks of the line of posts for a safety zone, that the right of way given did not include that portion of the street bed, and that she was free to occupy that space and assured of safety in it. This, according to the testimony of the traffic officer at the intersection, called as a witness by her, was a mistake. As has been stated, that portion of the street was opened to send the traffic over it. But taking it for granted that this was contrary to the plaintiff's understanding, and even that she was trapped by the mistake, the driver could not be expected to act

contrary to the true fact. He was at liberty to move on the right of way given him, and to expect pedestrians to accommodate their movements so as not to interfere, as pedestrians commonly do. *Kelly v. Huber Baking Co.*, 145 Md. 321, 338, 125 A. 782; *McNab v. United Rys. & Electric Co.*, 94 Md. 719, 729, 51 A. 421; *Garvick v. United Rys. & Electric Co.*, 101 Md. 239, 246, 61 A. 138; *Steil Co. v. Washington, B. & A. E. R. Co.*, 120 Md. 419, 422, 87 A. 838. There is nothing to show that sending the traffic through at times is unusual; the sign is made moveable to effectuate that purpose as required. And no reason is made to appear in this case for concluding that it was other than necessary. But if it should be considered negligent to do so without some form of notice not given, the negligence would not have been that of the driver. He did not make the arrangement, and was merely driving along as the authorities controlling the movements of traffic intended he should. With cars parked at the sidewalk there would seem to have been scant room for him to drive between them and the posts.

If the driver, in sufficient time, had seen the plaintiff was standing within the car's path, and also that, unaware of the danger, she would not move, but would continue so standing until struck, there might have been ground for finding him negligent in not avoiding her. *Legum v. State*, 167 Md. 339, 355, 173 A. 565. But that ground was not touched upon by evidence. There is no testimony from which a jury could judge of the driver's opportunity to see the plaintiff and realize, in time to stop or turn aside, that she would be standing in his way. To repeat, the only witness to his movements, he himself, testified that he had just started behind a couple of other vehicles; and the other witnesses testified that the plaintiff was moving forward and walked in front of the cab.

This analysis of the case leads a majority of the court to the conclusion that the evidence, however it may be regarded on the question of contributory negligence, is

insufficient to support a finding of negligence in the driving of the defendants' cab.

*Judgment reversed, without a new trial, with costs.*

OFFUTT, J., filed a dissenting opinion as follows:

For the purposes of this memorandum the following facts are conceded by the demurrer prayer in this case and may be assumed; Street car tracks run east and west along the middle of Redwood Street in Baltimore City. South of the tracks and west of the intersection of that street with Light Street several iron pipes set in heavy movable iron bases are used to fence in a narrow space next the east bound car tracks, primarily for the protection of persons entering or leaving cars at that point. The arrangement is a common one familiar to all travelers on city streets, and the space is usually known and was referred to in this case, even by the police, as a "safety zone." A metal disk bearing the legend, "Keep to the Right," was mounted on a standard at one end of the zone. At times that sign would be turned so that its edge would be presented to east bound traffic and its face to the southern sidewalk of Redwood Street; at others its face would be towards east bound traffic on Redwood Street and its edge towards the sidewalks. There is a traffic light at that intersection, and at the time of the accident the sign faced the sidewalk.

On the day of the accident the plaintiff was walking north on Light Street. When she reached Redwood, the light was against north bound traffic. She waited a moment and the east bound traffic cleared. She then walked over to the safety zone and was standing in the pedestrian crossing within a space which would have been bounded by the lines of the safety zone had they extended so far, two or three feet from an end rod of the safety zone. Other persons were standing near her, and the policeman on duty there said that he thought the "crowd hid the view of the car and she couldn't see it." While

she was in that position, a cab east bound was driven through the safety zone at from ten to fifteen or eighteen miles an hour, struck and injured her. She testified that when she started towards the safety zone she looked for east bound traffic but saw none then, that she did not look west after she reached the safety zone, and that when she was struck she was standing still looking for west bound traffic.

A majority of the court reached the conclusion that these facts, if true, afford no evidence legally sufficient to permit an inference of primary negligence on the part of the driver of the taxicab. Or to put it another way, they reached the conclusion that the act of the driver in driving his cab through a safety zone in which a group of people were standing at the rate of fifteen or eighteen miles an hour in such a way as to strike one of the group was due care as a matter of law. And, if I understand it, the reason for that conclusion is that the traffic light was against northbound traffic, and the "Keep to the Right" sign so arranged as not to be legible to east bound vehicular traffic. I find myself unable to follow that reasoning.

Obviously the traffic light could not change the character of the fenced off space, or convert what was in fact a safety zone into what was in fact not a safety zone. The function of the light is to alternately stop and release lines of traffic flowing transversely, so as to give each in turn an opportunity to proceed. It has no connection with safety zones, is wholly independent of them, and the only possible relation between the two is that the safety zone may afford pedestrians who have crossed one half of a street a refuge where they may stop in safety until the changing light permits them to cross the remaining half.

Nor could the mere turning of the "Keep to the Right" sign have that effect. The iron uprights were still there, and the testimony in the record is that they were connected by chains. The sign could have been turned by anyone. Ordinarily the police arrange it, but there is

no evidence that they did so on the day of the accident. A collision might disarrange it, or persons waiting in the zone could turn it either by accident or design, yet, if it is turned, no matter how or why or by whom, the mere fact that it faces the sidewalk instead of the traffic, in the view of the majority, converts what was an instant before a safety zone into a forbidden space which pedestrians may not enter except at their peril.

But while safety zones are primarily for the safety and convenience of street car patrons, they are also for the safety and convenience of all pedestrians who may have occasion to cross the street where they happen to be located. It may happen that the light will change after a pedestrian leaves the sidewalk, releasing traffic against him. In such a case the zone gives him what should be a place of safety where he may remain until the light changes again. Whether he intends to take a street car is wholly irrelevant, because his safety should depend, not upon the ability of the drivers of vehicles approaching the zone to read his mind, but upon the inviolability of the safety zone in which he has taken refuge. For as stated in a California case: "The travelling public has the right to assume that a safety zone or station is what its name implies, namely, a place of safety reserved for those waiting to board or depart from street cars at that point, 'an area or space officially set apart * * * for the exclusive use of pedestrians. * * *'" *La Sance v. Casey*, 211 Cal. 383, 295 P. 520, 521. In Code, art. 56, sec. 173 (Ed. 1935), a "safety zone" is thus defined: "The term 'safety zone' shall include all parts of the public highways or private rights of way which are elevated above the traveled road bed, or set apart therefrom for the exclusive use of pedestrians or street car passengers and which are guarded or protected against vehicular travel by posts, plantings, curbing or otherwise, or which are appropriately marked or designated as safety zones by duly constituted State or municipal authorities." He should be entitled to presume that, whether the traffic is routed to the right or to the

left of the safety zone, in no event will it invade the zone itself. Otherwise instead of being a safety zone the space would be a death trap, for, after luring travellers into it by its misleading appearance of safety, they would be exposed to all the hazards of traffic, without the apparent need for the vigilance they would naturally exercise if they were without the apparent protection of the safety zone.

Moreover, in the very nature of things persons operating motor vehicles along city streets must take notice of the obvious and universally known fact that persons are entitled as of right to be in a position where they may leave or board surface railway cars. It may well be that a pedestrian may start for the car tracks from the sidewalks with the traffic light permitting his progress in that direction, but that it will change before or as he reaches the tracks, or it may be that, even though the light is against him, the absence of traffic makes it safe for him to proceed to the car tracks. When he reaches the car tracks under such conditions, he is in no sense negligent, and should be entitled to presume that persons operating motor vehicles will anticipate his possible presence and exercise reasonable care to avoid injuring him. Notwithstanding the incredible volume of motor traffic, no satisfactory substitute for the street car for mass transportation has been adopted, and the countless millions of persons who patronize such cars are entitled to protection in their undoubted right to patronize them. Such persons cannot board or leave such cars at the sidewalk, because the car tracks are in the middle of the street. To board the cars they must be where the cars stop, not on the sidewalk where they do not stop. Yet the effect of the majority opinion appears to be that persons operating motor vehicles are under no duty of anticipating the presence of pedestrians at the very place in the street where they must be if the street car system is to function at all. Even if there were no safety zones, nevertheless such operators, under universally known conditions, should, it seems to me, be bound to anticipate that persons

may be near the street car tracks at intersections where street cars stop. *A fortiori* they should be bound to anticipate the presence of pedestrians in safety zones.

In this case the pedestrian is charged as a matter of law with awareness of the approach of the taxicab, while the cab driver is as a matter of law assumed to be ignorant of the presence of the pedestrian, or the group of which she was a part, although the same opportunity of knowledge was open to both. That result involves the theory that the pedestrian was a sort of outlaw and bound to discover and avoid the cab, while the cab driver was authorized to drive through a safety zone without exercising any vigilance or care to discover the presence of the pedestrian at a place where he should have anticipated pedestrians might be.

These comments seem to be in harmony with the view taken generally by the courts and text-writers. In *Huddy, Encyclopedia of Automobile Law,* secs. 19 and 26, it is said:

Section 19. Safety Zones. "When one reaches a safety zone in a street, out of which vehicles are expected to remain, he may reasonably rely on the security thereby expected to be afforded. If he is struck by an automobile while in such a location, it is reasonable to charge the driver thereof with the results of the collision."

Section 26. Nonpassengers. "Pedestrians, who are crossing the street close to a standing street car, as well as the passengers of the car, are entitled to rely on the obedience by motorists of regulations, and may avail themselves of the benefit thereof in case of a collision. The government may well be said to be as interested in protecting the lives and limbs of non-passengers as it is in protecting those who are passengers; and it is recognized that the former are in no better position to protect themselves than are the latter."

In *Jarosz v. Geisler,* 219 Mich. 283, 189 N. W. 12, where deceased was struck by an automobile within two feet of the tracks at a usual stopping place for street cars, the court said: "Whether or not he intended to

board the car or to cross the street to the sidewalk, he had a right to believe that, while he was within that area, he would not be run down by an automobile. He had a right to assume that the driver of the automobile would exercise reasonable care and not drive his machine into the place where passengers are accustomed to get on and off of street cars."

And much to the same effect are *Kinear v. Guthrie,* 113 Kan. 692, 216 P. 280, 281, and *Collins v. Perry,* 241 Mich. 361, 217 N. W. 32, 33.

The majority opinion stated that the "plaintiff was crossing and taking a position in the street then, when to her knowledge it was given over to traffic moving across her path." As I see it there are two fallacies in that statement: One, that the plaintiff was "crossing," when the evidence shows that when she was struck she was not crossing at all but had crossed to a place just east of the safety zone and was standing still; the other, that the street was "given over" to the traffic moving against her course, because that assumes the principal question in the case, that the safety zone as a part of the street was not a safety zone, but given over to traffic.

The case of *Legum v. State,* 167 Md. 339, 348, 173 A. 565 is hardly in point, first because in that case the court was not dealing with a safety zone at all and, second, because on the evidence in that case it was held that there might be a finding that the automobile driver was negligent. Ordinarily the liability of one who drives an automobile into a person standing in a safety zone, or near railway tracks at a car stop, does not turn upon the existence of primary negligence, for ordinarily that is conceded, but upon contributory negligence, as in the *Legum* case. For "Normally, one standing in a safety zone might well expect automobiles would not be driven into it." *Scott v. Vaughn,* 140 Kan. 529, 37 P. (2nd) 1012, 1013. See, also, *Casteel v. Yantis-Harper Tire Co.,* 183 Ark. 912, 39 S.W. (2nd) 306. Moreover, there is no "giving over" of the street to traffic by the display of a red or green light. No statute defines the relative rights

of vehicular and pedestrian traffic at intersections where traffic is controlled by lights, or even by traffic officers, nor was there offered evidence of any ordinance or police regulation providing such a definition. It is of course common knowledge that traffic is and of obvious necessity must be guided and controlled by lights and traffic officers at busy intersections, but, in the absence of some statute, ordinance, or valid police regulation, it is not apparent how a highway may be "given over" to traffic proceeding in a given direction, so that regardless of traffic conditions persons proceeding against the light forfeit the right to have others using the street exercise ordinary care to avoid injuring them. Code (1935 Supp.), art. 56, sec. 209, in giving pedestrians the right of way at street crossings, excepts from the operation of the statute crossings where the traffic is controlled by traffic officers, but does not refer to lights. And while it may be that the purpose and effect of such lights in Baltimore City are defined by some ordinance or regulation, there was not in this case any proof of such an ordinance or regulation, and, in the absence of such proof, their existence cannot be assumed. *Shanfelter v. Mayor & City Council of Baltimore,* 80 Md. 483, 487, 31 A. 439.

Moreover, the opinion appears erroneously to assume that there was "scant room" for the driver of the automobile to drive between the posts and the sidewalk, first, because, while the plaintiff said that automobiles were parked "along the south curb there by the bank," it does not appear how far along the street the bank extended, nor whether there were any cars between the posts and the curb. On the other hand, the plaintiff said: "Machines could park there, I think, about three or four deep before they reach the car track. The car track was clear and the space on the south side of the car track was clear as far as I could see up to Charles Street." It is also assumed in the majority opinion that the plaintiff "assumed that vehicles were then, and at all times, excluded from moving along the tracks by the presence beside the tracks of the line of posts for a safety zone, that the

right of way given did not include that portion of the street bed, and that she was free to occupy that space and assured of safety in it. This, according to the testimony of the traffic officer at the intersection, called as a witness by her, was a mistake." But the record fails to show that the plaintiff assumed that vehicles were excluded from "moving along the tracks." She was not in the car tracks when she was struck, but within an extension of the safety zone. But what she did assume was that, whether traffic was routed to the right or left of the zone, it would not be routed over it. The mere fact that traffic was routed to the left of the zone did not change its character as a safety zone, for that is, to the knowledge of every one at all familiar with city streets, constantly done even where there are permanent concrete platforms guarded by pylons, but heretofore it has not been supposed that routing traffic to the left of a safety zone changed its character.

So that eventually the case comes to this: That defendant's automobile in broad daylight collided with plaintiff while she was standing still in a pedestrian crossing within the extended lines of a safety zone and about two feet from one of its posts, and at a point where persons desiring to board street cars which stopped at that point might naturally be; the collision occurred when the car was being driven at a speed of "fifteen or eighteen miles an hour" or "ten or fifteen miles an hour" (for the statement in the opinion that the driver had "just started" did not mean that he had just started from that intersection, but had "just started" at Charles Street, a block away), and it is consistent with the evidence that he could have driven on either side of the zone without striking the plaintiff.

For the reasons stated, and without further laboring them, I find myself unable to accept the view of the strong and able judge who wrote the majority opinion that such conduct is consistent with due care. It is a melancholy and notorious fact that, because of the criminal recklessness and callous indifference of many drivers of motor

vehicles, use of the public highways of the state is a hazardous adventure which may bring death or disaster to the most careful and the most prudent. To hold that the driver of such a vehicle may operate it over crowded city streets in blind disregard of conditions which are almost universal, appears to me to confer an immunity from responsibility for negligence which sanctions rather than condemns conduct which makes the public highways so unsafe.

URNER, J., also dissents.