## HENDERSON *v.* BROWN ET AL.

[No. 25, September Term, 1957.]

464

*Decided November 14, 1957.*

The cause was argued before Brune, C. J., and Henderson, Hammond and Prescott, JJ.

*Paul Berman* and *Melvin J. Sykes,* with whom were *William G. Kemp* and *Edward D. E. Rollins, A. Freeborn Brown* and *T. Carroll Brown,* on the brief, for appellant.

*Frederick J. Green, Jr.,* with whom were *James J. Lindsay* and *J. Gifford Scarborough,* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Chief Petty Officer Henderson was struck at night by a taxicab as he crossed the street in Port Deposit on the way back to Bainbridge Naval Training Center. The jury gave him a substantial verdict against both the driver and the owner of the taxicab, the trial court granted a motion for judgment n. o. v., and Henderson appealed.

The accident happened on Route 222, the main street of Port Deposit, in a residential area near the entrance to the Navy boat docks on the Susquehanna River. Henderson had dinner in Port Deposit and then spent the evening with friends. When he was ready to return to the naval base, shortly after eleven o'clock, he had someone call a cab for him and when it did not come promptly, decided to walk. He walked on the west or river side of the street in a southerly direction until the sidewalk ended at a point where a large hedge or bush grew. Then he walked around the bush and continued on some eighty feet on a hard shoulder about two or two and a half feet wide, which began at the bush, until he came to a striped light pole at the north side of the entrance to the boat docks. He crossed the boat dock entrance to a second light pole which marked the south side of the dock entrance fifty feet south of the first pole. At this point he decided to cross the street to reach the sidewalk on the other side. He says that this was a most logical place to cross because the Navy often marched sailors up from the docks across the street and on to Bainbridge and that other sailors often used it as an informal crosswalk, all of which was known to the Port Deposit taxi drivers, including the driver of the cab that hit him. He says further that the light on the pole was burning and illumined the area, as did light reflected from a white gasoline station several hundred feet to the south. The testimony of others indicates that the area was quite dark. Henderson testified that as he stood on the edge of the shoulder, he looked to his left and to his right, first looking to his left, from which the taxicab came, but he

saw nothing because "there is a hedge up there; you can't see beyond that." He estimated that he was then some one hundred thirty feet from the bush which stood, according to him, at the edge of the road and projected "at least a couple feet" beyond the shoulder and obstructed his view of almost half of the street to the north. He says that after he had looked both ways, "I stepped out and walked across at a fast gait across the street, and I got near the middle of the street I looked again to the south, again to the north, and by that time the car hit me." He was asked whether it had not occurred to him that there might be traffic behind the bush which he could not see, and his answer was that if there were, he thought he was far enough down the street to get away from it. He says: "I didn't hear nothing, didn't hear no horns, no motor running and no lights, and didn't see no lights." On cross-examination, he was asked whether it was his testimony that there were no lights on the cab or that he didn't see any, and he said: "I didn't see any lights." Once more he was asked whether he gave that answer because the cab had no lights or because it was so close to him, and everything happened so fast when he did see it, that he didn't know whether its lights were on or not. Again his answer was: "I didn't see a light."

Henderson thought that he had just about reached the tarred strip marking the center of the road when he was struck. The evidence makes it clear that he was struck by the right front fender of the cab. The driver says that he never saw Henderson at all before the impact. Two friends of the driver sitting with him in the front seat (there were two passengers in the back) testified that Henderson staggered or ran out of the darkness at the side of the road into the path of the cab so suddenly and so fast that although the driver immediately swerved to the left, it was impossible to avoid hitting him. There is nothing to show that the cab was on the wrong side of the street (except when it swerved immediately before the impact) or that Henderson was on the far half when he was struck. The driver and his two companions testified that the headlights were on low beam for city driving, that the advertising light on top of the cab (indi-

cating that it was a cab and its ownership) was lighted, and that this could have been true only if the headlights were lighted, as the two operated simultaneously.

The record offers no evidence or permissible inference that the cab was speeding. The driver testified that he was going about twenty or twenty-five miles an hour. There were no skid marks. A State trooper testified that the cab went twenty-eight paces from the point of impact to where it stopped.

After the most careful consideration, we have come to the conclusion that Henderson, by his own reckless inattention or indifference, contributed directly to his own injury in a manner so prominent and decisive as to leave no room for ordinary minds to differ as to its imprudence and, therefore, that the trial court was right in granting the judgment n. o. v. Although the record does not show the reason for the court's action, it is agreed that it was on the ground of contributory negligence. Assuming, then, for the consideration of the case that the cab driver was negligent, we pass to the reasons for our finding of contributory negligence.

The appellees say that the cab had the right-of-way at the place of the accident, whereas the appellant argues, as the court instructed the jury, that under the circumstances pedestrian and driver had "mutual, reciprocal and equal" traffic rights. The accident took place in a residential area of a town. Code, 1951, Art. 66½, Sec. 201, provides that: "All pedestrians shall have the right-of-way at street crossings in the towns and cities of this State * * *. Between street crossings in such towns and cities, vehicles shall have the right-of-way." There is no statutory definition of street crossings other than that given in Code, 1951, Art. 66½, Sec. 2 (9) of a crosswalk as "Any portion of a roadway distinctly indicated for pedestrian crossing by lines or other marking on the surface or that portion of a roadway ordinarily included within the prolongation or connection of the lateral lines of sidewalks at intersections." This statute makes no exception of areas where crosswalks are few. We think the cab had the right-of-way. In *Block v. Miller,* 199

Md. 521, 526, the pedestrian was injured in Baltimore while crossing Light Street from the entrance to a passenger pier, prominently marked "Entrance" and which vehicles were not allowed to block. Opposite the entrance, in the middle of car tracks in the middle of the street, were six or seven metal buttons to mark the point where the streetcars stopped. It was held that the buttons did not make the area a marked crosswalk and that the fact that passengers and visitors entering and leaving the pier customarily crossed Light Street at that point did not make it an unmarked crosswalk. It was argued that if it were not held to be a crosswalk there would be no safe crossing for pedestrians. The opinion noted that there were officially marked crosswalks nearby but said that even if there had not been, their absence would not entitle pedestrians "* * * by custom or habit to establish a crosswalk which then gives them the right of way". In *Johnny's Cabs, Inc. v. Miller,* 199 Md. 16, the accident happened at the juncture of a street and a heavily traveled alley, commonly accepted as a recognized intersection. There were no official crosswalk markings on the street, and the alley had no sidewalks of which there could be a prolongation. It was held that the taxi which struck the child coming from the alley into the street had the right-of-way.

A pedestrian who crosses a street between intersections is not negligent *per se,* but he must use the greatest care for his own protection. While both the pedestrian and the driver have an equal right to use the street, the amount of diligence and care needed on the part of each is shifted from one to the other according to where the accident happens. When a pedestrian crosses between intersections, the law requires him to know that he must accommodate himself to vehicles on the road, that he cannot dispute their right-of-way but must cross only as the traffic affords safe opportunity. These rules give the measure and color of what the pedestrian must do and what the driver can rightfully expect him to do. *Bond v. Forthuber,* 198 Md. 476, 484; *Credit Co. v. Merryman,* 173 Md. 256, 262; *Weissman v. Hokamp,* 171 Md. 197; *Thursby v. O'Rourke,* 180 Md. 223.

Maryland cases have adopted the language of Judge Car-

dozo in *Knapp v. Barrett,* 216 N. Y. 226, 230, as to one who crosses the street: "The law does not say how often he must look, or precisely how far, or when or from where. If, for example, he looks as he starts to cross, and the way seems clear, he is not bound as a matter of law to look again." In Maryland the language, generally if not always, has been applied where the pedestrian was crossing at a crosswalk, it being said that having looked and seen no vehicle, or having seen a vehicle at a distance justifiably thought to be safe, the wayfarer was entitled to assume that an oncoming vehicle would respect his right-of-way. See, for example, *Merrifield v. Hoffberger,* 147 Md. 134; *Taxicab Co. v. Ottenritter,* 151 Md. 525; *Shaivitz v. Etmanski,* 164 Md. 125; *Legum v. Moran,* 167 Md. 339; *Sheriff Motor Co. v. Parker,* 169 Md. 79. The same rule might well apply, under some circumstances, when the pedestrian was crossing where he did not have the right-of-way. If, as he started to cross, he looked, and the view gave him credible assurance of adequate opportunity and ability to cross safely, he might not, as a matter of law, be said to be negligent in failing to look again, although common prudence would seem to say that it would be better to do so. In the case before us, the appellant himself says that the bush one hundred thirty feet to the north of him blocked his view and that he assumed that a vehicle behind the bush would be far enough away to let him cross safely; therefore, he did not again look to his left until he was in the middle of the street, just before he was struck. The photographs in the record and the testimony indicate that the bush did not protrude as far, or obscure the street as much as the appellant says, and they leave little doubt that if he had looked again after he had taken two or three steps toward the middle of the road, the bush would not have obstructed his view at all. Consideration of the disadvantageous and inadequate view of southbound traffic afforded him from where he first looked (because of the obstructing bush and the angle at which such traffic approached the bush) and of his realization that he must guess whether traffic behind the bush that he could not see was far enough away not to be a threat, leads us to find the act of the appellant in crossing

the road, without looking again to the left, reckless as a matter of law.

In *Jackson v. Forwood,* 186 Md. 379, 385-386, the pedestrian alighted from a bus, went around in front of it to cross the road (incidentally, the same road involved in the case before us) and saw a car approaching from her right some four hundred feet away. She walked across the front of the bus, looked to her left and kept on walking. When she again looked to her right, she was in the path of the car she had seen, and it was so close to her that she could not avoid it. The Court said: "The court can reach but one conclusion from these facts. It is that her actions contributed directly to the accident." In *Bond v. Forthuber,* 198 Md. 476, 484, *supra,* the pedestrian was crossing between intersections. He testified that he waited several minutes until traffic cleared before starting across. He was looking south until he reached the center of the street, when he looked north once more and immediately was struck by an automobile. The Court said: "If plaintiff's testimony fails (as we find it does) to show that he was walking in the crosswalk, it shows, *e. g.,* from the fact that he did not see defendant's car until it was within 'approximately one foot' of him, that he exercised no care at all in this undertaking." In *Males v. Davidson,* 200 Md. 296, the injured girl, who did not have the right-of-way, looked right and left before leaving the curb, but did not look again and was hit near the middle of the road. A directed verdict for the motorist was upheld. See also *Dean v. Scott,* 196 Md. 70; *Cocco v. Lissau,* 202 Md. 196; *Cioffari v. Blanchard* (Mich.), 47 N. W. 2d 718, 720; *Glazier v. Tetrault* (Me.), 90 A. 2d 809, 812. On the facts, compare *Ebert Ice Cream Co. v. Eaton,* 171 Md. 30, where the evidence showed that the pedestrian looked twice to the left while on the near half of the road and was struck on the far half by a car driving on its wrong side of the street; and *Credit Co. v. Merryman,* 173 Md. 256, *supra; Geschwendt v. Yoe,* 174 Md. 374; *Thursby v. O'Rourke,* 180 Md. 223, *supra.*

The appellant finds himself in the dilemma of the unfortunate and, later, unsuccessful litigants in the line of cases beginning with *Webb-Pepploe v. Cooper,* 159 Md. 426, who

while crossing between intersections were struck by vehicles which they say they looked for but did not see. See, for example, *McGarrey v. Duffy,* 175 Md. 634; *Billmeyer v. Whiteman,* 192 Md. 419, which reiterate that the pedestrians either looked carelessly or not at all, for if they had looked properly they must have seen. Appellant's counter that from Henderson's testimony he never saw any lights, either when he looked the first time, or just as he was struck, the jury could properly have found the taxi was without lights. It is argued earnestly that this testimony was not mere negative evidence, insufficient to support a verdict against the positive testimony that the lights were on prior to and at the time of the accident. The claim is that since the witness directed his attention to the presence or absence of lights and was so situated that in the ordinary course of events he would have observed the lights if they had been burning, the testimony is positive. Relied on are *Matthews v. Pohlmyer,* 167 Md. 689 (Unrep.), 176 A. 479; *Perry v. Butler* (Me.), 48 A. 2d 631, both of which dealt with headlights; as well as *Krause v. B. & O. R. R. Co.,* 183 Md. 664. We recognize the force of the rule argued for, but think it inapplicable on the facts. In the *Matthews* case, the injured pedestrian testified that he looked a number of times while crossing the wide street, that he saw the cab that hit him, and that it had no lights on it. In *Perry v. Butler* the witness testified that the vehicle he saw had no lights on it. Here, Henderson did not say there were no lights. Moreover, he did not claim that he relied on the absence of reflection from behind the bush, but merely, on cross-examination, agreed to a suggestion that headlights might shine through the bush. When appellant first looked, the cab, because of the curve in the road, must not have been approaching the bush directly but on a southeasterly tangent which would have thrown the headlight beam across rather than into his line of vision. This might well have caused him not to notice it. The second look, made when the cab was upon him, afforded him no chance to see any details. Twice, when asked specifically whether he wished to testify that the cab had no headlights or merely that he saw no headlights, his answer was only that he saw no headlights. Appellant did not show

that at any time he was so placed as to be able to have adequately observed the presence or absence of lights, and therefore his testimony would have enabled the jury, at most, only to speculate that the cab had no lights in the face of credible, positive testimony that it did. The appellant is thus left in the situation of one who either did not look when he should have, or did not see when he did look, and this, therefore, requires the finding that he was contributorily negligent as a matter of law.

*Judgment affirmed, with costs.*