# WILLIAM H. DASHIELL

*vs.*

# MELVIN O. JACOBY.

*Injury by Automobile—Person Alighting from Street Car—*
*Safety Zones—Pedestrian's Right of Way—Witness—*
*Statement of Inference—Motion to Strike Out—*
*Discretion of Lower Court.*

The statement of a witness as to the speed at which defendant was driving his automobile, based merely on his reasoning that if defendant had been going at a less speed he could have stopped within a less distance than that in which he did stop, should have been stricken out, defendant testifying that his reason for not stopping sooner after the accident was his difficulty in getting off the street car track, on which he had driven and which was fitted with T-rails. pp. 334-336

The discretion of the trial court as to whether to strike out evidence already admitted is not unlimited. p. 336

Courts have power to strike out testimony based on unreasonable and false assumptions of fact, if a motion to that effect is seasonably made. p. 336

Defendant cannot complain that of two prayers granted at plaintiff's request, while one is correct, the other is in such conflict therewith as to cause confusion, since such confusion would affect plaintiff and not defendant. p. 338

The court has no power to determine what is a safety zone, within the meaning of Code, art. 56, sec. 150, requiring every vehicle, "except where safety zones are provided," to stop not less than five feet from a street car, headed in the same direction, which is taking on or discharging passengers, there being nothing in the statute or elsewhere to aid in such determination, and the requirements as to what constitutes a safety zone varying with the circumstances and the nature of the locality. pp. 338-340

Code, art. 56, sec. 163, providing that all pedestrians shall have the right of way at street crossings, does not justify a prayer submitting to the jury to find that defendant did not give the right of way to plaintiff at the intersection of P. and S. Avenues, and that plaintiff was leaving a car bound north on P. Avenue, which had stopped at S. Avenue, and attempted to cross P. Avenue in an easterly direction, and that such failure to give the right of way to plaintiff at such intersection caused the accident, the prayer not in terms confining plaintiff's right of way to the street crossing, and there being evidence that plaintiff was crossing diagonally.                p. 341

*Decided January 10th, 1923.*

Appeal from the Superior Court of Baltimore City (STANTON, J.).

Action by Melvin O. Jacoby against William H. Dashiell. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Edward L. Ward,* with whom were *R. Contee Rose, Edwin W. Wells,* and *Preston & Field* on the brief, for the appellant.

*Allan H. Fisher,* with whom were *Fisher & Fisher* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment for $10,000 obtained by the appellee (plaintiff) against the appellant (defendant) for damages for injuries sustained by the former by reason of the alleged negligence of the latter in running his automobile at the corner of Park Heights Avenue and Spring Hill Avenue, in the City of Baltimore. At the place of the accident, Park Heights Avenue runs northerly and southerly,

and Spring Hill Avenue crosses it at right angles. The United Railway Company had two tracks near the center of Park Heights Avenue. There were T-rails on the tracks at that place. Park Heights Avenue was a wide street and Spring Hill Avenue was about thirty feet wide, and had no street cars on it. There was a hedge running along the side of the tracks between them and the paved way on Park Heights Avenue. At the time of the accident the plaintiff lived on the east side of Park Heights Avenue, at No. 3807, the bed of which street, from the hedge to the sidewalk, is twenty-one feet on that side and twenty-feet on the other side of the tracks. The plaintiff lived in the fourth house, or second double house, from the corner.

There is a platform along the tracks on the east side, just south of Spring Hill Avenue. The motorman described the platform as being from two and a half to three feet wide, and sixteen to eighteen feet long, running parallel with the track. It was long enough to take in both ends of a street car. The defendant testified that it was between three and four feet wide. It was made of cinders, but had a cement coping around it, and was four or five inches above the bed of the street. The night of the accident (about 10.30 P. M.) a north bound car stopped south of Spring Hill Avenue to take on and to let off some passengers. Two passengers got on from the platform at the rear of the car, and the plaintiff and three ladies got off at the front. The conductor said when the two passengers got on he saw the defendant's automobile behind the street car, off to one side and not on the track. One of the young ladies testified that when they reached Spring Hill Avenue the plaintiff, her sister, a young lady from Atlantic City and witness stood on the platform of the car in that order, waiting for the motorman to open the door. The plaintiff stepped down and then her sister. The latter said she followed right after the plaintiff, and as she was about to step down, before she had a chance to put her foot down, she heard the thud. The motorman said that the plaintiff "stepped off the car and he stepped down, and he

made a couple of steps or two, and the automobile struck him." He said that the plaintiff was lying on the side of the car track, about ten feet beyond Spring Hill Avenue; that his attention was first called to the accident by the crash; that the machine went right down the open car line, the open rail, about half way between Spring Hill Avenue and the next stop; "that the car stopped and after the crash he saw the machine continue, and he was not going very slow, he was going at a good rate of speed, twenty-five or thirty miles an hour." The plaintiff said: "I made a step off the street car that way, as far as I could when the automobile hit me; presumably the automobile. I didn't know what had hit me." Again he was asked: "Did you step on the cinder path or the bed of the street? A. The cinder path. Q. How did you get off the cinder path? A. After I stepped one or two steps off the cinder path I was hit."

The defendant's explanation was that when he noticed the street car coming to a stop that the front part of his car was about the rear platform of the street car, and that his automobile reached about the front platform of the street car, about the same time the car stopped; that he lessened his speed as he came to Spring Hill Avenue, when he was going about fifteen miles an hour, and then described the accident as follows: "As the street car stopped, the front platform opened and Mr. Jacoby jumped from the street car *across the safety zone* and ran diagonally across Spring Hill Avenue; as I noticed him coming I swerved my car to the left, thinking he would run past, but as he got in front of the car he stopped and turned towards my car—I overlooked something—as he jumped from the car, the street car, he had his head turned towards the street car, as if speaking to some one on the car; as he got in front of my machine, I swerved my car to the left to avoid him, thinking he would run past and I would miss him that way; but he stopped and turned facing my car, and I struck the young man and he fell in a ditch between the track and the hedge; as I continued, I noticed I was making for a trolley pole, and in order to

avoid hitting the trolley pole, I turned my car to the right, on to the tracks and then endeavored to get off the tracks, but on account of the T-rail setting up above the tracks I had some difficulty in getting over; in fact, I could not get over it at that time without taking too much time, and I stopped the machine and ran back to the young man." He said that "when he (plaintiff) started diagonally across the street he was running; that the front part of the radiator hit the plaintiff; that he had no bumper on his car; that the plaintiff stopped about in the center of Spring Hill Avenue and he turned his car to the left to avoid striking him * * * that when he turned to the left he went up on the car track, as there was no hedge at that point; that his car went up on the tracks, and to avoid hitting a street car pole he turned north on the tracks; that he was straddle the west rail of the north bound track; that he supposes he went up the track 100 feet, trying to work his way off the track, and that this would be nearly half way to the next avenue." The lady whom the defendant married after the accident was with him, and she corroborated his account of the accident.

The motorman testified in chief "that his car stopped and after the crash he saw the machine continue, and he was not going very slow, he was going at a good rate of speed, twenty-five or thirty miles an hour." On cross-examination he said he could not tell how fast he was going down the track, and that he must have slackened, but said that when he hit the young man he was going twenty-five or thirty miles an hour. He said he could not say how fast he was going on the track, and this appears in his evidence in the record: "Q. How fast? Was he going fast? A. I could not say. Q. Whether two, five or ten miles an hour, you cannot tell? A. I could not tell; when he hit him he must have been going more than 18 miles an hour or he would not have gone that far before he stopped. Q. That is your judgment, but you cannot tell us how fast he was going when he got on the car track? A. No, I could not tell you. Q. When you say 25 or 30 miles an hour did you have an opportunity to observe

the rate at which the automobile was going before it hit him?
A. No, sir. Q. You did not have an opportunity to observe
the speed of the automobile before it hit him, did you? A.
No, sir. Q. What make you say it was going 25 or 30
miles an hour then? How could you tell the jury it was
going 25 or 30 miles an hour? A. If a man was only going
18 miles an hour I do not think he would go over three-
quarters of a block before he could stop his car. Q. Is that
your only reason? A. Yes, sir."

The defendant then made a motion to strike out the testi-
mony of the witness as to the speed of the automobile at the
time of the accident. That motion was overruled, and the
ruling is presented by the first bill of exceptions. There
could be no doubt that that was not a sufficient reason for him
to base his evidence on as to the speed at the time of the acci-
dent. It was not evidence, but argument, and it was argu-
ment which was entitled to but little consideration. The
defendant could not well have gone any thing like twenty-
five or thirty miles an hour along the railroad tracks, with
cross-ties, ballast and T-rails on it, but the witness excluded
from his calculation the reason that the defendant after-
wards gave for going so far—that is to say, in his effort to
get out of the track, over that sort of rail. He might well
have sought for some place to get over the rail, or have gone
some distance in trying to get over. Mr. Fleischman, a wit-
ness for the plaintiff, who lived at No. 3938 Park Heights
Avenue, said: The first thing he saw was rather a subdued
crash of some kind, which caused him to turn and look to-
wards the car tracks; he saw the automobile going up the car
tracks, bouncing along the ties, the track at that point is not
as they have it in the city, but somewhat similar to the rail-
road tracks.

If the evidence of the motorman had been based on testi-
mony showing that the defendant was going so fast when the
accident occurred that he could not stop his car on the street
until he went over three-quarters of a block, it might have
been said to be some reason for fixing the speed he did, but in

the first place, not only the defendant, but Messrs. Robinson, Friedman and Fleischman, plaintiff's witnesses, spoke of the car going about half a block—not "over three-quarters of a block before he could stop his car," as the motorman said. His testimony was pure guesswork, based on false premises. There is no doubt about the admissibility of evidence in reference to speed, and motormen ought to be good judges of it, but when a witness, whether he is a motorman or somebody else, gives as a reason for his opinion of the speed, such testimony as the motorman gave, his opinion, based on such false and unreasonable assumption of the facts, should not be permitted to remain in testimony. While an intelligent jury ought not to be influenced by such testimony, they were liable to be confused, and might well have understood that the motorman was basing his evidence on the speed as of the time of the accident and was relying on what he saw at or about the time the car passed him. Indeed his evidence was in answer to this question: "You tell the jury when you saw him going down the railroad track he was going at the rate of twenty-five to thirty miles an hour? A. I said when he hit the young man; I din't say when he was going down the track." Just as soon as it became apparent that the motorman was basing his evidence on what he said he did, it should have been stricken out. The motion to strike out the evidence was properly made when the motorman said that his only reason for fixing the speed at twenty-five or thirty miles an hour was "that he would go over three-quarters of a block before he could stop his car."

Of course the trial court ordinarily has large discretion as to whether to strike out evidence already admitted, but that discretion is not without limit. Courts have the power to strike out testimony based on unreasonable and false assumptions of fact, if a motion is seasonably made when it is discovered what the witness has based his evidence on. We are not now passing on the competency of the motorman to testify as to the speed the automobile was going, which he had the opportunity to see and did see, but the question is

whether the evidence should be permitted to remain in when
he shows that he was not judging of the speed as he saw it,
but from his conclusion based on unreasonable and improper
grounds.   This Court recently passed on the question whether
a motion to strike out testimony should be considered, al-
though the objection was not made immediately after it was
offered.   In *Mitchell* v. *Slye,* 137 Md. 89, 100, JUDGE OF-
FUTT, in speaking for the Court, said: "The rule requiring
objections to testimony to be made promptly is for the pur-
pose of facilitating rather than retarding the administration
of justice, and should receive a reasonable interpretation; and
even when the objection comes after a question has been
answered, if it appears that the delay was inadvertent and
unintentional, and what, under all the circumstances, was
reasonable diligence was exercised, or that no sufficient op-
portunity had been given to make it sooner, the objection
will be considered to have been taken in time."   See also 1
*Wigmore, Evidence,* sec. 18, p. 53; *Marsh* v. *Hand,* 35 Md.
123, 127; *North* v. *Mallory,* 94 Md. 305.

While we would not interfere with the action of the trial
court in such matters unless we were satisfied that the party
making the motion used due diligence in doing so, when such
is the case a motion to strike out improper evidence should
be granted.   There can be no doubt as to what this motion
included.   It was to strike out the testimony of the witness
"as to the speed of the automobile at the time of the acci-
dent."   That was the material question—not how fast he was
running on the cross ties after the accident, excepting in so
far as that reflected on the speed at the time of the accident.
We are, therefore, of the opinion that it was injurious error
not to grant the appellant's motion.

The appellant excepted to the granting of the plaintiff's
first, second, fourth, fifth and sixth prayers, and refusing his
first, second, third and fourth prayers.   Without repeating
them, we have no doubt about the correctness of the court's
rulings in rejecting the prayers of the defendant.   There was
legally sufficient evidence of negligence on the part of the

defendant to go to the jury, and there was no such evidence of contributory negligence on the part of the plaintiff as would have justified the court in taking the case from the jury. It is unnecessary to refer to authorities on those subjects, and we will not do so, as the principles are too well settled to require that to be done.

The first prayer of the plaintiff was intended to apply to the provision in Code (vol. 4), article 56, section 150, which reads as follows: "Except where safety zones are provided, the driver or operator of every vehicle shall bring the same to a full stop not less than five feet from the rear of any street car headed in the same direction which has stopped for the purpose of taking on and discharging passengers, and remain standing until such car has taken on or discharged its passengers." It concluded with, "then their verdict must be for the plaintiff, unless the jury shall find from the evidence that a safety zone was provided at the point where the plaintiff alighted from said street car." By the plaintiff's fourth prayer, which was granted, the jury was instructed "as a matter of law that the landing for passengers at the intersection of Park Heights and Spring Hill Avenues mentioned in the evidence in this case is not a safety zone within the meaning of section 150 of article 56 of the Code of Public General Laws (sub-title, Motor Vehicles)."

The appellant contends that there was such conflict in those prayers as to make the granting of the two injurious error. We do not agree with him in reference to that, for if the fourth was a correct instruction, any confusion that arose in reference to the first affected the plaintiff, and not the defendant. We might give more reasons for that conclusion, but do not deem it necessary. The real point, it seems to us, is whether the court properly granted the fourth prayer. The accident complained of occurred in a part of the city that might not require the same character of safety zones as would be necessary where the streets are much more used and are often crowded. The object in placing guard rails or chains around a portion of the street adjoining the tracks of

a street car company is to prevent automobiles and other vehicles from running the passengers down as they are getting on or off street cars. It may be that, in a locality where the street car tracks are on cross ties filled in with stone ballast, with T-rails on them, platforms four or five inches above the surface of the street would afford all reasonable protection as safety zones, as well as aid in getting on and off the cars. The statute does not define "safety zones," does not say what shall be deemed such, or who shall determine how they shall be constructed. It certainly does not in terms authorize the court to say what a safety zone is, and people may well differ about it. Some might deem themselves very much better protected from automobiles and other motor vehicles by being on a platform erected above the level of the street than by simply having guard rails or chains on posts placed on the level of the streets.

It would seem that there ought to be some person or body authorized to determine what they should be in different localities, as it is unquestionably very dangerous to have automobiles and other motor vehicles running by street cars, which are taking on or letting off passengers. Anyone who uses street cars to any extent has probably observed that some drivers of automobiles are particularly careless and indifferent to the safety of others getting on or off street cars, but if there is a platform built, as we understand the one in question to be, passengers getting off the cars can stand on the platform until they have the opportunity to see whether an automobile or other vehicle is approaching, and might be better protected than by some other arrangement. But, however that may be, the difficulty is that there is nothing in the statute or elsewhere, so far as we have found, which defines what a safety zone is, and that being so, we do not see how the court could say as a matter of law, that the platform was not a safety zone within the meaning of the statute. There is nothing in *Buckey* v. *White,* 137 Md. 124, which can properly be interpreted to give the court such power. In that case the court was called upon to determine the meaning

of "intersecting roads," as used in the statute, but that is a very different matter from determining, as a matter of law, what a safety zone is, within the meaning of section 150 of article 56. There may be some cases in other jurisdictions where the question has been definitely passed on, but after a somewhat diligent search we have found none, and we have been cited to none. In the absence of some description in the statute as to what is a safety zone, it must to some extent depend upon circumstances. That statute is not applicable to Baltimore City alone, but all cities and towns throughout the State where there are street cars, and, as we have indicated, what would furnish safety in one part of the Baltimore City limits might not in another. There is not uniformity in the different cities as to the requirements of such places, by whatever name they be known, so far as we are informed. It is argued by the appellee that there was no light on this platform, but there is no statute requiring lights, and if there is an ordinance in Baltimore City so requiring we have not been referred to it. There was evidence that there was an arc light at the corner, and nothing to suggest that the fact that there was no light on or at the platform in any way contributed to the accident.

It would be difficult to find evidence in this record which could have justified the jury in finding that the failure of the appellant so to stop his automobile until the street car had taken on or discharged its passengers caused the accident, as is submitted by the first prayer, for if, as the defendant and his wife testified, he was running about the middle of the street, on the east side of the track, he was some distance from the platform, but as there is no special exception to the prayer which would cover that, we need not further refer to it. We only do so because the judgment must be reversed for other reasons, and we do not want to be understood as holding that that prayer was satisfactory in all respects.

The fifth prayer of the plaintiff ought not to have been granted in the shape it is in. We are not aware of any statute which provides as parts of that prayer submitted to

the jury.   It starts by saying that under the law all pedestrians shall have the right of way at *street crossings,* except when traffic is controlled at such crossings by traffic officers. It then submitted to the jury to find "that on the occasion aforesaid, the defendant did not give the right of way to the plaintiff *at the intersection of Park Heights Avenue and Spring Hill Avenue,*" and that the plaintiff *was* alighting from a street car north bound on Park Heights Avenue, which had stopped at Spring Hill Avenue, "and attempted to cross Park Heights Avenue *in an easterly direction,*" "and that the failure of said Dashiell upon approaching said intersection to give the plaintiff the right of way caused the accident," etc.   Section 163 of article 56 provides that "all pedestrians shall have the right of way *at street crossings* in the towns and cities of the State.   *Between street crossings* in such towns and cities, vehicles shall have the right of way." There is nothing in the prayer to confine the right of way that plaintiff was using to crossings.   The defendant and his wife testified that he started across Park Heights Avenue diagonally, and under the prayer he might have been going "in an easterly direction," but still diagonally across the street.   He testified that "he was going to the corner of the 3700 block and not across Spring Hill Avenue, not diagonally across to the 3800 block corner," but Mr. and Mrs. Dashiell testified he was going obliquely or diagonally across.   There was, therefore, error in granting that prayer.

For the error set forth in the first bill of exceptions, and in granting the fourth and fifth prayers, the judgment must be reversed.

> *Judgment reversed and new trial awarded, the appellee to pay the costs.*