MILTON JENDRZEJEWSKI *v.* PERCY BAKER

[No. 12, April Term, 1943.]

42

*Decided April 29, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*Foster H. Fanseen* and *Philip S. Ball* for the appellant.

*Leonard Weinberg* and *Everett L. Buckmaster,* with whom were *Weinberg & Green* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

Belair Road, for the purpose of this case, will be considered to run north and south. Eierman Avenue, which is twenty-four feet two inches wide from curb to curb, runs to the west side of this road, and opposite this intersection on the east side is an alley nineteen feet two inches wide, which intersects Belair Road. The north side of Eierman Avenue, if projected across the road, would enter this alley at a little to the south of its center. One hundred and twenty feet north of the intersection of this alley and the Belair Road, and parallel with the alley, Nicholas Avenue enters from the east, but does not cross over Belair Road. It is twenty-three feet six inches wide from curb to curb. At this location the Belair Road is seventy-two feet and one-half inch from curb to curb. It is a modern, well-paved highway. In the middle of the road are two electric car tracks, the one to the west carries southbound traffic and the one to the east northbound traffic. From the west

rail of the northbound track to the east rail of the south-
bound track is about six feet and seven and one-half
inches. Eighteen feet north of a line drawn from the
northeast corner of the road and the aforesaid alley is
a pylon and immediately north of the pylon, paralleling
the east rail of the northbound track, is a safety zone
about eighty-one feet long and three feet eight inches
wide. From the west line of this safety zone to the east
rail of the northbound track is about two and one-half
feet and from the east curb of Belair Road to the east
rail of the northbound track is a distance of twenty-three
feet. On the west side of the road, paralleling the west
rail of the southbound track, there is a similar safety
zone, the pylon being at the north end thereof. At the
northeast corner of Nicholas Avenue and Belair Road
is a fruit stand. This location is in northeast Balti-
more.

Percy Winfield Baker lived on Seidel Avenue and at
about 11 o'clock on the night of January 22, 1942, he
left his home to go to a plant in southwest Baltimore,
where he was employed. The night was clear and the
street dry. He walked to Nicholas Avenue, thence west
to the corner of that avenue and Belair Road, where he
stopped for a few minutes. He could see, several blocks
to the north, sparks caused by contact of the trolley
pole with the wire and knew a southbound car was ap-
proaching before he could see it due to a hill that inter-
vened. His intention was to take a southbound electric
car and he usually boarded the car at the south end of
the safety zone on the west side of the road as passen-
gers were taken on in the front end of the car at that
point. He walked to the north end of the safety zone
on the east side of the road, down the safety zone to
three feet north of the pylon at the southern end of the
zone. While at that point he saw an automobile, its lights
burning, traveling north, and it was at that time, he esti-
mates, one hundred and twenty-five to one hundred and
fifty feet from the pylon. He does not know how fast

it was approaching, but the uncontradicted evidence in the case is that it was running thirty miles an hour, which was the speed limit at that time. He says that the left-hand wheels of this automobile, when he first saw it, were on the east rail of the northbound track. It thus appears if its course had not been changed it would have hit the pylon. Running at thirty miles an hour an automobile travels forty-four feet per second, so that when he first saw this automobile, if we translate the speed to time, it was less than four seconds from him. The machine was traveling at a lawful rate of speed to the right of the center of the road and was in a place on the road where it had a right to be. The whole of the safety zone was between this alley on the south and Nicholas Avenue to the north. So that at the time the plaintiff saw this automobile he was in a safety zone, a place of safety erected for pedestrians to board electric cars, and this safety zone was between street intersections. The witness further stated that when he saw the automobile its front end deviated slightly to the right and he thought that it was going to pass to the right of the safety zone and not to the left. He further states that acting upon his assumption that the automobile would pass to the right of the safety zone, he left his position of safety behind the pylon and started to cross to the west side of the road. When he had taken one or two steps out, he testified, this automobile swerved suddenly to the left when it was twenty-five feet from him. He spun around in an effort to get back in the safety zone, was struck by the right fender of the car, his leg was broken and he was severely injured. There were only two witnesses to this accident and they are the driver of the car (the defendant here) and the plaintiff himself. The car travelled down near the fruit stand at Nicholas Avenue and stopped. The defendant got out of his car and went back to the plaintiff. At that time a gentleman and his wife, who lived in that block, having heard the impact, came out and were with the plaintiff.

An ambulance was called and he was taken to the hospital.

The negligence upon which this case is grounded is charged to be the passing of this safety zone at the left, thus surprising the plaintiff who thought it was going to pass to the right. The plaintiff urges that he was not required to wait in a place of safety for five or six seconds when this car would have passed him and the accident would not have happened, but that under these circumstances he had a right, with this automobile only one hundred and fifty feet at most from him, to proceed across the Belair Road between intersections where the right of the motorist is preferred over the pedestrian, and it was negligence on the part of the motorist to pass the safety zone to the left and that the plaintiff was perfectly free of negligence contributing to the accident. We know of no authority that substantiates this contention. According to the plaintiff's own testimony he saw this car traveling in such a position along that road, which if continued it would have struck the pylon. He must have known, considering his testimony to be the true version of the accident, that the motorist would change the course of his car and thus avoid striking the pylon. He first said that the left wheels of this automobile were on the east rail of the northbound track; then that the front of it was pointing a little to the right and he left his place of safety upon the assumption that the car would go to the right of the pylon. When he had taken one or two steps from the place of safety, thus placing himself in a place of peril, he says, when this car was twenty-five feet from him it swerved to the left and thus caused the accident. So that the contention is that the operation of the automobile by the defendant mislead him and he started to cross the road. It seems to us to be quite extraordinary that a motorist operating his car at thirty miles an hour, when he gets one hundred and fifty feet from a pylon, would run directly towards it, shift a little to the right and then

46

suddenly swing to the left without coming into contact with the pylon.

To lay down a rule of law that one who is in a place of safety upon the highway and sees an automobile, which, measured in time, is less than four seconds from him, could leave his place of safety upon the assumption that the motorist having the right of way would go to the right instead of to the left of the safety zone, and if the motorist surprised the pedestrian and took a course that the pedestrian thought that he would not take, that this would be negligence, would result in many more traffic accidents, which are now too many, and would be against public policy which labors for safety.

The doctrine of the last clear chance has no application, for there was no evidence in the case whatever that the defendant, by the exercise of ordinary care and caution, saw the plaintiff in time to prevent the accident. It is one of those cases where one in a place of safety steps into a position of peril and is injured. Without passing upon the question of primary negligence, we consider the act of the plaintiff, under the circumstances in this case, in stepping from a place of safety into a place of peril, was so distinct, prominent and decisive as to amount to contributory negligence as a matter of law. *Taxicab Co. of Baltimore v. Emanuel,* 125 Md. 246, 93 A. 807; *Jones v. Wayman,* 169 Md. 670, 182 A. 417; *Bozman v. State,* 177 Md. 151, 155, 9. A. 2d 60; *State v. Brandau,* 176 Md. 584, 6 A. 2d 233; *Webb-Pepploe v Cooper,* 159 Md. 426, 151 A. 235 *State v. Insley,* 181 Md. 347, 29 A. 2d 904.

The defendant's "B" prayer asked the court to instruct the jury "that from the uncontradicted evidence in this case the plaintiff was guilty of negligence directly contributing to the accident complained of and, therefore, their verdict must be for the defendant." This prayer should have been granted and the case withdrawn from the jury.

*Judgment reversed, with costs to appellant, without a new trial*