STATE, USE OF STEHLEY *v.* BELLE ISLE CAB CO.,
INC., ET AL.

[No. 89, October Term, 1949.]

552

*Decided February 15, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Z. Townsend Parks, Jr.,* with whom was *Howard C. Bregel* on the brief, for the appellant.

*Samuel S. Smalkin,* with whom were *Ginsberg & Ginsberg, H. Beale Rollins* and *Sigmund R. Kallins* on the brief, for the appellees Abels and Keim.

*Theodore Sherbow*, with whom was *James J. Lindsay* on the brief, for the appellees Hopper and the Belle Isle Cab Co., Inc.

MARBURY, C. J., delivered the opinion of the Court.

The accident, from which this case arose, took place on the morning of September 24, 1948, about 6:15 a.m., at the intersection of North and Pennsylvania Avenues in the City of Baltimore. The deceased, Alexander Stehley, was a 59 year old employee of the Baltimore & Ohio Railroad. He lived in Forest Park and worked at the Mt. Clare Shops. To reach his place of work it was his custom to leave home at 5:50 a.m., take a street car at Belle and Garrison Avenues and then, at North and Pennsylvania Avenues, transfer to a street car going south on Pennsylvania Avenue. On the morning of his death he left for work at his usual time. He alighted from a street car on the safety zone at the southwest corner of North and Pennsylvania Avenues and then started to cross towards the northwest corner of North and Pennsylvania Avenues on a green traffic signal. He was apparently struck by an ice truck when he was about at the northernmost rail of the west bound car tracks on North Avenue, and then, subsequently, was run over by a taxi cab, and was found by a police officer under the latter at 6:24 a.m. He was, at that time, apparently dead. He had wounds and fractures of five ribs, compound fractures of the fibula and tibia on the right leg and fracture of the left leg just above the knee. At the time of the accident it was dark and the street lights were on. The suit was brought under the provisions of Article 67 of the Code, by the widow and sole dependant of the deceased against the operator, Abels, and the owner, Keim, of the ice truck, and against Belle Isle Cab Co., Inc. and its driver, Hopper. At the end of all of the testimony the court directed a verdict in favor of all defendants, and from the judgment entered on this verdict, this appeal comes here.

It is now agreed by the appellant that the ice truck was loaned by Keim to Abels for use solely on the busi-

ness of the latter, and, therefore, the appeal from the judgment in favor of Keim is abandoned.

Pennsylvania Avenue does not cross North Avenue at right angles. The acute angle made by the crossing is at the southwest. The safety zone located near the corner, but not at it, is placed there in order to permit passengers from the street cars to alight in safety from cars passing along the street between this zone and the south sidewalk of North Avenue. There are no marked cross walks at the intersection, and in the absence of such marks, the pedestrian's right of way across North Avenue is the space between the extension of the building line of Pennsylvania Avenue on the west and the extension of the curb line of that avenue on the east. Code, Article 66½, Section 2, sub-section (a) (9). Within this space pedestrians have the right of way, and outside of this space, vehicles have the right of way. Code, Article 66½, Section 181. When a pedestrian starts to cross a street, in such cross walk, with a green light, he has the right to continue, even though the light changes during his progress (providing he is proceeding in the normal manner), and vehicles must give him the right of way. *Shaivitz v. Etmanski*, 164 Md. 125, 164 A. 169; *United States Fidelity & Guaranty Co. v. Continental Baking Co.*, 172 Md. 24, 29, 190 A. 768; *Caryl v. Baltimore Transit Company*, 190 Md. 162, 58 A. 2d 239. These questions become important in this case because, apparently, the light did change, and both the ice truck and the cab, which were going west on North Avenue, had the green light when they reached the intersection and started across.

There is some confusion in the testimony of the only person who saw the deceased start across the street. The safety platform is long enough to permit two or three cars to stop beside it. The deceased got off the first car, which was there, and a seventeen year old colored newsboy who was occupied in disposing of his papers, got off the second car. This newsboy testified that the deceased left the safety platform, and, in one place in his testimony, there would seem to be an indication that

he started across the street between the two street cars. However, in other parts of his testimony the witness said the deceased started across in front of the first car. As this is the testimony most favorable to the plaintiff, we take that testimony as the basis for our consideration of the case. This witness also made a mark on the blackboard to show the place where the deceased left the safety platform. This mark is not at the east end of the platform, but even if we assume that the deceased went to the east end, and from there started across the street to go to the northwest corner, where he would have to take his street car, he would still be several feet from the projection of the sidewalk when he reached the place where the evidence shows he was struck. There is, therefore, no evidence whatever that he was within the space where he would have the right of way with a green light. *Billmeyer v. State, use of Whiteman,* 192 Md. 419, 426, 64 A. 2d 755, 758.

The driver of the truck testified that he was driving west in the west-bound car tracks at a speed of about 25 to 30 miles an hour. The light was green when he reached Pennsylvania Avenue, remained green as he crossed it, and about 40 or 45 feet west of Pennsylvania Avenue a man darted out from the south side of North Avenue, running north. He was about three yards in from of him when he first saw him. He tried to avoid hitting him, and applied his brakes, but the man, according to him, tripped on the north rail and fell. The driver of the truck said he did not think he hit him, but the officer, who examined the truck, said there was a fresh rub mark on its right front wheel and also, on the top of the radiator, there was a fresh rub mark. The taxi cab was at the right and to the rear of the truck, proceeding in the same direction. The driver was looking ahead, and to the right to see if there were any passengers. He said that when he got into North Avenue, after crossing Pennsylvania Avenue, his headlights picked up the body of a man lying across the road. He was then 20 or 25 feet away. He put on his brakes, but skidded over to him and ran over him with the wheels

of the cab. The truck at this time was about eight feet in front of him. The officer testified that there was a 42 foot skid mark beginning six feet west of the west curb line of Pennsylvania Avenue, and running up to the front wheels of the taxi cab, and underneath the taxi cab was the deceased. The right skid mark was thirteen feet eight inches south of the north curb line of North Avenue.

Assuming, as we must, that the truck did hit this man at or about the north rail of the west bound car tracks, which is the testimony most favorable to the plaintiff, the truck at that time had the right of way, as it was proceeding on a green light. There was, as we have stated, an obligation on the truck driver to give that right of way to any person who had already started to cross in the pedestrian cross walk, but that obligation only extends to those pedestrians who are using the defined right of way to cross the street. *Chasanow v. Smouse,* 168 Md. 629, 632, 178 A. 846; *Legum v. State, Use of Moran,* 167 Md. 339, 173 A. 565. The deceased had not yet reached the cross walk, and there is no evidence that the truck driver saw or could have seen him until he was about three yards ahead of the truck. The truck driver was not bound to anticipate that a pedestrian would cross the street between cross walks, and whether or not the deceased had the green light when he started, if the truck driver did not see him until too late to stop, we are unable to find that the truck driver was guilty of any negligence. If he could have seen him, even though he was not in the cross walk, and had time to avoid him, that would raise another question. But there is no such evidence, and under the circumstances we think a verdict in favor of the driver was properly directed.

When we come to the consideration of the case against the taxi, we find a different situation exists, because here we have a possible application of the doctrine of last clear chance. In *Jendrzejewski v. Baker,* 182 Md. 41, 31 A. 2d 611, we held that a pedestrian who left a safety

zone, similar to the one in the case before us, and wrongly guessed the side of the zone on which an automobile was passing, was guilty of contributory negligence. A passenger who alights from a street car on a safety zone, has a right, of course, to leave that zone in any direction he sees fit. Unlike other jurisdictions (See *Nisley v. Sawyer Service, Inc.* 123 Or. 293, 261 P. 890) there is here no prohibition against a pedestrian walking anywhere in the street he desires. But if he steps from a safety zone in front of an oncoming automobile or street car, he is just as guilty of contributory negligence as if he stepped off a sidewalk in the middle of a block under similar circumstances. There is evidence in this case that Stehley left the safety zone and crossed the car tracks in front of the truck, which at that place and time had the right of way. If he was struck by the truck under such circumstances and thrown in the path of the taxi, his negligence continued at least until the end of that particular impact when he was recumbent. That was when the taxi driver said he first saw him, and it is from that moment that we must determine whether the taxi driver had no chance to avoid running over him as a matter of law.

He was driving (he said) between fifteen and twenty miles an hour. He put on his brakes, both hand and foot, thus affecting all four wheels of the cab. He skidded straight over the figure he saw lying in the roadway in front of him, and, apparently, from the marks on the road, pushed Stehley three or four feet before the cab stopped with Stehley under it, behind the front wheels which had passed over him. The cab driver said Stehley was twenty or twenty-five feet away when he first saw him lying in front of him, but the officer who measured the skid marks leading to his front wheels said they were forty-two feet long. If we deduct the four feet Stehley was pushed, and, even if we assume the beginning of the skid mark was made by the rear wheel and the end by the front wheel (of which there is no evidence), and deduct the distance between the wheels and assume

this to be ten feet (without any evidence) the brakes must have been applied when the man on the street was twenty-eight feet away. In order to determine when the taxi driver first saw him, we must add to this distance, the space travelled by the taxi after the driver saw the figure, and before the braked wheels began to mark the pavement—in other words during the time required to transmit to the pavement the result of the driver's impulse. It is obvious that, no matter how quick might have been the reflexes of the driver, the car did travel *some* distance while the driver was putting on his brakes and while the brakes were taking hold with sufficient grip to skid the wheels. There is no evidence how far this was but it is a frequent occurrence to put on brakes and it is a matter of common and ordinary knowledge that some time elapses before the impulse to apply them is transmitted into their application. If we add some space to that already shown by the skid marks it becomes apparent that the driver saw Stehley when he was at least several car lengths away. He had thirteen feet to his right in which he might have turned to avoid the recumbent figure. When he was asked whether he could have done so, he said he did not know. He said he did all he could, but the physical facts do not bear this out, at least to an extent that we can say he did not have the last chance to avoid the accident after he saw Stehley in his path.

Of course when a driver is confronted with an emergency, even if he does the wrong thing, he is not necessarily held liable, but whether his actions under such circumstances are negligent, unless the facts are undisputed, is not a question of law for the court, but is a question for the jury. *Newman v. Stocker*, 161 Md. 552, 157 A. 761; *Consolidated Gas etc. Co. v. O'Neill*, 175 Md. 47, 200 A. 359; *Fogle v. Phillips*, 191 Md. 114, 60 A. 2d 198. In view of the mute evidence of the skid marks, and in view of the wide space to the right to which the taxi might have been turned, we think there was a jury question presented whether or not the driver of the taxi was

negligent. We think therefore, that a verdict should not have been directed in favor of the taxi cab company and the driver, but that the case against them should have been submitted to the jury.

Judgment affirmed as to Orem Richard Abels and Louis C. Keim, with costs. Judgment reversed with costs as to Belle Isle Cab Co., Inc. and Philip Hopper, and case remanded for a new trial against these defendants.

MARKELL, J., dissents in part and delivered the following dissenting opinion.

I cannot agree that when a "safety zone", sometimes called a safety island, does not extend to a street intersection, it is for the street car passenger, as a matter of law, *only* a safety island, completely surrounded by a sea of perils, where he has no right of way to escape to either shore, automobiles on every side have a right of way to mow him down blindly and he can only plunge into the sea and perish, unless by chance, without legal right or protection, he manages to reach shore and survive. In his plight this court says that "the truck driver [or the taxicab driver] was not bound to anticipate that a pedestrian would cross the street between cross walks, and whether or not the deceased had the green light when he started, if the truck [or taxicab] driver did not see him until too late to stop, * * * the * * * driver was [not] guilty of any negligence." The driver may mow him down blindly because the driver is not bound to "anticipate" what every one knows, viz., that a passenger cannot make his abode on the island but must try to "cross the street", to one side or the other, and can only do so where the island is, *i.e.*, "between [street intersection] cross walks."

This Draconic result is reached by construing several statutory provisions, intended for the protection of street car passengers, as having the combined effect of giving him no protection but depriving him of the protection he had at common law without statutory requirement. At common law, before safety zones or traffic lights or

statutory rights of way or requirements of stopping behind street cars, the automobile driver's duty of due care in all circumstances—which has never been superseded by statute—included a duty to "anticipate" the obvious dangers of running by street cars. "* * * it is unquestionably very dangerous to have automobiles and other motor vehicles running by street cars, which are taking on or letting off passengers. Anyone who uses street cars to any extent has probably observed that some drivers of automobiles are particularly careless and indifferent to the safety of others getting on or off street cars * * *." *Dashiell v. Jacoby*, 142 Md. 330, 339, 120 A. 751, 754. *Cf. Winner v. Linton*, 120 Md. 276, 87 A. 674; *Maryland Ice Cream Co. v. Woodburn*, 133 Md. 295, 105 A. 269; and cases collected in Note, 47 A. L. R. 1233, on liability of the owner of a motor vehicle for injury to a person who has alighted from or is waiting for a street car. Such liability has been enforced in cases of accidents at regular stopping places not at a street crossing, and in cases of persons crossing in front of the street car to the left sidewalk, or crossing behind the car to the sidewalk. See cases cited in *Berry on Automobiles* (7th Ed.), paragraphs 3.310, 3.318, 3.319. In some circumstances the street railway company may also be liable for letting off a passenger at a dangerous place. *Berry*, paragraph 3.312.

Safety zones and stop laws do not supplant but implement the duty of due care. In Maryland the stop law is an alternative for a safety zone. "Except where safety zones are provided, the driver * * * of every vehicle shall * * * stop" at least five feet behind a street car which has stopped. Code, Supplement 1947, art. 66½, sec. 183. A safety zone thus relieves the driver of an automobile of the statutory duty to stop, but not of the universal duty of due care. *Dashiell v. Jacoby, supra.* It has never been suggested by the court that because a safety zone does not extend to the street intersection (as it seldom does) the passing motor car driver is thereby relieved of all duty to look out for the passenger.

In *Dashiell v. Jacoby,* there was a platform along the tracks "just south" of the intersecting street, and plaintiff "jumped from the street car *across the safety zone,*" necessarily still further south. *Supra,* 142 Md. 332, 333, 120 A. 751. Though the stop law does not protect the passenger on the island, he is protected either if, (*a*) the safety zone is a "marking on the surface of the roadway" which "distinctly indicates a portion of the roadway for pedestrians crossing" or if (*b*) the duty of due care includes the same care to look out for passengers leaving the island as to look out for passengers leaving a street car in the absence of an island or a stop law. In ignoring both of these views of this case, the court in effect holds that the successive physical devices and legal duties required by statute, largely or solely for the protection of passengers and other pedestrians, *e.g.* safety zones, traffic lights, the stop law and statutory rights of way, have defeated each other and destroyed the paramount duty of due care, so far as the pedestrian on an island is concerned, and have outlawed him as a "jaywalker", as if he had selected the location of the island and had deliberately selected a forbidden one.

The definition of a "crosswalk" in section 2(a) (9) supplants judicial interpretation of "street crossing" as meaning a customary or reasonable crossing in case of an irregular intersection. *Legum v. State,* for Use of Moran, 167 Md. 339, 173 A. 565; *Consolidated Gas & Electric Light and Power Company v. Rudiger,* 151 Md. 226, 134 A. 326. As applied to regular rectangular crossings, the new definition may simplify and clarify the law. As applied to irregular crossings, the imaginary lines in the definition would often be dangerous and inadequate and would be quite unworkable as a measure of due care.

No case has been cited, and I have found none, which outlaws any passenger marooned on a safety island who takes the most direct route to escape. By a reasonable construction of section 2(a) (9) a safety zone *per se* indicates a "crosswalk". In any event the duty of due

care requires the same protection for the passenger in crossing, whether or not he has a technical right of way. The only cases on like facts that I have found in any jurisdictions seem to sustain both of these propositions.

In *Nisley v. Sawyer Service, Inc.*, 123 Or. 293, 261 P. 890, 891, the facts were substantially the same as in the instant case except that the passenger was crossing from the island to the near side of the street. The court said, "The 'safety island' was either placed in the street by the city or with its permission. It was not at an intersection of two streets, but was near the middle of the block between Morrison and Yamhill streets. It was placed in the street to facilitate loading and unloading passengers. The 'safety island' would be of no benefit if the passengers were not permitted to pass from the sidewalk to the island and from the island to the sidewalk. It cannot be said that a passenger on a street car who passes from the island directly to the sidewalk, thereby traveling a distance of 10 feet, is violating a city ordinance because he is crossing the street at a place other than an intersection. A person passing from the island to the sidewalk is crossing part of the street at a place designated by the city authorities, or under their supervision. The ordinance provides that pedestrians shall refrain from crossing streets within the restricted district, except at the regular crossings and at right angles. Plaintiff was crossing at right angles the part of the street between the platform and the sidewalk. If it be conceded that he was crossing the street within the meaning of that term, as used in the ordinance of the city of Portland, then we must conclude that he was crossing at a regular crossing, because we cannot conceive that the city, in order to protect the lives and limbs of its citizens, would require a person to travel longitudinally along the street more than 40 feet, and then be as far from the sidewalk as he was from the place from which he started. To do so would be to require the citizen unnecessarily to take the extra hazard of walking near the center of the street

in the midst of the traffic in a congested and restricted area, and then at right angles through the traffic to the sidewalk. A street car had just unloaded passengers at the 'safety island.' It was the duty of all automobile operators to proceed with the utmost caution to avoid injuring a passenger while passing from the safety island to the sidewalk. Plaintiff had all of the right to cross from the island to the sidewalk that the defendant had to operate his car between the platform and the sidewalk. Whether or not plaintiff was guilty of negligence in not discovering the automobile before it struck him is a question of fact for the jury under all circumstances."

In *Kingston v. Hardt*, 18 Cal. App. 2d 61, 62 P. 2d 1376, the same result was reached (one judge dissenting) in a case (like the instant case) in which the passenger was crossing to the far side of the street. See also *Croxall v. Broadway Department Store*, 127 Cal. App. 153, 15 P. 2d 546.

A pedestrian who sees an automobile a few seconds distant and steps off a safety island in front of it, may be guilty of contributory negligence. *Jendrzejewski v. Baker*, 182 Md. 41, 31 A. 2d 611. In the instant case, unless any attempt to leave the island is negligence *per se*, as "failing to yield" the all-encircling right of way, the victim in the instant case was not, as a matter of law, guilty of contributory negligence. He grasped the only straw at hand, the traffic light. When the light changed his reliance on it proved illusory in fact; the court now holds it was illusory in law. He had no chance of escape at all to the south. Cars dash by on the south at all times, to the light when it is red, through it when it is green. In the circumstances any question of contributory negligence is for the jury.

In *Kingston v. Hardt, supra,* in which the passenger crossed to the far side of the street, the court said [18 Cal. App. 2d 61, 62 P. 2d 1378], "If custom and usage has established the practice of walking from the safety island over the Van Ness tracks to the safety zone on the easterly side of that avenue, then to the curb, and then

to the boarding zone on Geary, it cannot be said as a matter of law that one is guilty of contributory negligence in following that established custom. On the other hand, if no such custom or practice is established, and the course followed by the plaintiff was the course which a reasonable person would have followed under the circumstances, the question of contributory negligence is equally one to be determined by the jury."

I concur in the result in reversing the judgment as to the taxicab and in holding the evidence legally sufficient to show that the taxicab driver, after he saw the victim knocked down by the truck and lying helpless in the street, could by the exercise of due care have avoided running over and killing him. I cannot concur in finding the victim guilty of contributory negligence or breach of duty to the taxicab driver in being knocked down by the truck, or in the dicta, apparently an afterthought, on the subject of "last clear chance". When the driver saw the victim lying helpless in the street it was his duty to exercise due care to avoid him. How he got into his helpless position—whether by being shot down by a gunman, or thrown out of a truck or car by kidnappers, or by his own negligence—is immaterial. This broad elemental principle is the basis—or one of the bases—of the "last clear chance" doctrine; to treat it as in any way based upon or affected by that doctrine is to put the cart before horse. If the victim had negligently stood still in the street and was not really helpless or unable to step out of the way of the taxicab, it would have been necessary to determine whether the taxicab driver had the "last clear chance" to avoid him after it was too late for him to save himself, *i.e.*, whether his continuing negligence was a concurrent—or sole—proximate cause of his injury and death. As the victim was obviously helpless when the taxicab driver first saw him, no question of contributory negligence (and, as the court now holds, there was no "primary" negligence) or "last clear chance" is presented. The confused subject of "last clear chance" becomes only more confused if applied outside of its proper field.

It is incredible that the legislature, by cumulating physical and legal protections for street car passengers, intended to leave them on an island without any physical or legal protection at all in getting off. The street car seems to be on the way out. If before it becomes extinct drivers of motor vehicles become aware of their rights and their freedom from any duty to look out for passengers trying to escape from a safety island, passengers will be extinguished unless the Baltimore traffic authorities paint on the surface of the roadway lines of escape for pedestrians, which ought to be plainly enough "marked" by the island itself without "saying it with paint."

I think the judgments should be reversed as to both the truck and the taxicab.